Larry K. DANKS Appellant–Petitioner

v.

STATE of Indiana, Appellee–Respondent

No. 46A03–9908–PC–330.

Court of Appeals of Indiana.

Aug. 3, 2000.

Transfer Denied Sept. 29, 2000.

Linda M. Wagoner, Indianapolis, Indiana, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BARNES, Judge

### Case Summary

Larry K. Danks appeals the denial of his post-conviction petition that sought relief from his conviction for felony murder entered pursuant to a plea of guilty but mentally ill. We affirm.

### Issues

Danks presents two issues for our review, which we restate as follows:

1. whether a delay of nearly six and one-half years between his purported arrest for murder and robbery and the filing of charges for those offenses constituted a denial of Danks' Sixth Amendment right to a speedy trial;

2. whether Danks received ineffective assistance of counsel.[1]

## Facts

The facts relevant to this petition, as found by the post-conviction court, are as follows. On May 11, 1978, a robbery occurred at a gas station in LaPorte County, during which the attendant, Gary Adkins, was shot and killed. On May 19, 1978, another robbery took place at the same gas station and another attendant, Kenneth Thomas, was also murdered.[2] The LaPorte County Sheriff's Department apprehended Danks as a suspect in the May 19 incident on May 20, 1978, and detained him in the LaPorte County jail. After being advised of his rights Danks gave a statement to a police detective in which he implicated himself in both the May 11 and May 19 incidents. A warrant for Danks' arrest was issued on May 23, 1978, based on the police detective's probable cause affidavit stating that Danks had implicated himself in the May 11 and May 19 incidents. The LaPorte County Prosecutor's Office also filed charges related to the May 19 incident on May 23, 1978, though it did not file charges for the May 11 incident. In September, the LaPorte County Prosecutor's Office formally suspended further investigation into the May 11 incident, though charges were still not filed.

The trial court subsequently found Danks incompetent to stand trial on February 23, 1979, and he was transferred to the Logansport State Hospital following his involuntary civil commitment. The Prosecutor's Office received periodic reports related to Danks' competency during his commitment. On March 21, 1984, Danks was determined to have regained his competency. After a transfer of venue from LaPorte to Porter County, a jury found Danks guilty of the May 19 incident on November 30, 1984, and it recommended a sentence of death. The trial court rejected the recommendation and sentenced Danks to serve 46 years in prison.

Meanwhile, on October 2, 1984, LaPorte County Chief Deputy Prosecutor Craig Braje ("deputy prosecutor") filed an information against Danks related to the May 11 incident that included a death penalty request. The trial court appointed Gregory Hofer ("defense counsel") to represent Danks in this new proceeding. Aside from a notice of intention to interpose an insanity defense, defense counsel filed no other motions on Danks' behalf, although he had considered filing a motion to dismiss based on the State's delay in the filing the charges. Danks himself approached the deputy prosecutor at a court hearing and requested a plea in exchange for the dropping of the death penalty.

At Danks' sentencing hearing in 1986 on his plea of guilty but mentally ill to the felony murder count of the State's information, defense counsel spoke of the "strategic decisions" he had made in handling Danks' case and indicated that he had not filed a motion to dismiss or any other motions because of his reluctance to sour potential negotiations with the deputy prosecutor. The trial court sentenced Danks to 60 years imprisonment on the May 11 incident charges to be served consecutively with the already imposed 46–year sentence. The State agreed to give Danks credit for nearly eight years time served, dating back to May 20, 1978, the date of his initial confinement in the LaPorte County Jail. The trial court later corrected the sentence, pursuant to a motion to correct error, and ordered that the terms be served concurrently.

---

1. Danks' "Statement of Issues Considered for Review" in his brief lists a third issue, "[w]hether Danks' plea was knowingly, intelligently and voluntarily entered," Appellant's brief p. 1, but no argument regarding this issue is made and thus we will not consider it.

2. Throughout this opinion, we will refer to the events occurring on May 11, 1978 and May 19, 1978 as simply the May 11 or May 19 incidents, respectively.

In 1986, only a few months after his judgment of conviction was entered for the May 11 incident, Danks filed a pro-se petition for post-conviction relief (PCR). Little or no action was taken on this petition until 1996, when counsel filed another PCR petition on Danks' behalf that was deemed to be an amendment to the 1986 pro-se petition. Both petitions sought relief only from the conviction for the May 11 incident; Danks has never challenged the conviction for the May 19 incident. The post-conviction court conducted a hearing on the petition in December 1998 and denied relief in July 1999. This appeal followed.

## Analysis

### I. Post-Conviction Relief Standard

█ Post-conviction proceedings do not provide a petitioner with a "super-appeal," and do not substitute for direct appeal. Ind. Post-Conviction Rule 1(1)(b); *Benefiel v. State*, 716 N.E.2d 906, 911 (Ind. 1999). Instead, the post-conviction rules create a narrow remedy for subsequent collateral challenges to convictions. *Id.*

█ The challenger of the denial of post-conviction relief must demonstrate that the evidence, taken as a whole, is without conflict and that it "leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court." *Id.* at 912. The post-conviction petitioner bears the burden of establishing his grounds for relief by a preponderance of evidence. P-C.R. 1(5). On review, the appellate courts may consider only the evidence and reasonable inferences supporting the judgment of the post-conviction court, which is the sole judge of the evidence and the credibility of the witnesses. *Blunt–Keene v. State*, 708 N.E.2d 17, 19 (Ind.Ct.App.1999).

### II. Prejudicial Delay

██ Danks claims that he was prejudiced by the State's delay from May 1978 to October 1984 in filing charges against him for the May 11 incident.[3] Initially, we note that Danks claims the delay in charging him with the May 11 incident violated his constitutional rights to due process and to a speedy trial. However, the question of whether a delay in prosecution has violated a defendant's due process rights under the Fifth Amendment is a separate and distinct question from whether his or her Sixth Amendment speedy trial right has been violated. *Compare Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (Sixth Amendment speedy trial right applies only within confines of a formal criminal prosecution) *with United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (Due Process Clause of the Fifth Amendment may require dismissal if *pre-accusation* delay by government causes substantial prejudice to a defendant's right to a fair trial and delay was an intentional device to gain tactical advantage over the accused). The analysis in Danks' brief regarding prejudicial delay is confined to the Sixth Amendment question, as the only cases cited in support of his argument (*Doggett v. United States; Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Harrell v. State*, 614 N.E.2d 959 (Ind.Ct.App.1993)) are Sixth Amendment cases and Danks asserts that he was "officially accused" as of May 1978. Therefore, pursuant to Ind. Appellate Rule 8.3(A)(7) we consider any argument with respect to an unconstitutional delay under the Fifth Amendment to be waived. *See Sturma v. State*, 683 N.E.2d 606, 610–11 (Ind.Ct.App.1997).

█ When considering the issue of whether a defendant's right to a speedy

---

**3.** Since Danks plead guilty to the May 11 incident there was no trial in that case, and thus there is no "ending date" by which to measure precisely his speedy trial claim. Nevertheless, as Danks focuses on the approx-imately six-and-a-half year delay between his purported arrest in May 1978 and the filing of charges in October 1984 as the basis of his claims of unconstitutional delay, we will use that time frame in our analysis.

trial under the Sixth Amendment has been violated, courts should consider the length of delay, the reason for the delay, the defendant's assertion of his or her right to a speedy trial, and prejudice to the defendant. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192 (1972). None of these four factors is either a necessary or sufficient condition to finding a deprivation of the speedy trial right. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. *Id.* at 533, 92 S.Ct. at 2193. The question of prejudice must be assessed in light of the interests of defendants that the speedy trial right was designed to protect: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) most importantly, to limit the possibility that the defense will be impaired. Id. at 532, 92 S.Ct. at 2193.

The Supreme Court revisited the question of speedy trial claims under the Sixth Amendment in *Doggett,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). There, the Court emphasized the importance of the reason behind a delay and its relation to the defendant's need to demonstrate actual, particularized prejudice caused by the delay. Specifically, in between delay caused by bad faith, which weighs heavily against the government, and delay that results even though the government has diligently pursued prosecution, lies delay caused by official negligence. Such delay is weighed more lightly than deliberate delay but it still is an unacceptable reason for delaying a prosecution. *Id.* at 656–57, 112 S.Ct. at 2693.

■■■■ "[A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim," *Id.* at 655, 112 S.Ct. at 2692, but "to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." *Id.* at 657, 112 S.Ct. at 2694. In other words, up to a certain, unspecified point in time a defendant must demonstrate that a delay in being brought to trial has caused particularized prejudice, even if the delay resulted from official negligence. After that point the existence of prejudice may truly be "presumed" and the defendant may be entitled to speedy trial relief, even though proof of actual prejudice is lacking. The time period required to grant speedy trial relief without proof of actual prejudice shortens with the increased egregiousness of the government's conduct causing the delay and vice versa.

■■■■ With respect to the burden of proof when speedy trial relief must be premised upon the existence of actual prejudice, that burden rests on the defendant. It is true that post-accusation delay exceeding one year has been termed "presumptively prejudicial" to a defendant, but this "does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Doggett,* 505 U.S. at 652 n. 1, 112 S.Ct. at 2691 n. 1. Even if a defendant establishes that a delay was "presumptively prejudicial" in this sense, he still must specify precisely how the delay affected his ability to defend himself against the charges in order to succeed on a speedy trial claim. *Gilmore v. State,* 655 N.E.2d 1225, 1227–28 (Ind.1995).

■■■■ Assessing Danks' speedy trial claim, we come to the following conclusions. First, we will assume that Danks was "officially accused" of the May 11 incident as of May 20, 1978, for purposes of commencing the speedy trial clock. As of that date, Danks was detained in the La-Porte County Jail, where he remained until his transfer to the Logansport State Hospital several months later. The official arrest warrant prepared on May 23, 1978, was supported by a probable cause affidavit reciting Danks' involvement in the May 11 incident, as well as the May 19 incident. In addition, police detective Arland Boyd indicated his own belief that Danks was under arrest for the May 11 incident at

that time. When Danks was sentenced for the May 11 incident in 1986, the State agreed to give him credit for time served dating back to May 20, 1978. Finally, the State's brief does not challenge the finding of the post-conviction court that Danks was accused as of May 20, 1978.

■■■ Second, the delay in this case was undoubtedly long; it is sufficiently long so that inquiry into the *Barker* factors is required. Third, although Danks at no time before these post-conviction proceedings raised a speedy trial concern, we will assume for purposes of this discussion, and the discussion concerning the effectiveness of defense counsel, that the issue was timely raised. However, upon consideration of the cause for the delay and prejudice to Danks, we must conclude that Danks' speedy trial claim fails.

■■■ The State's investigation into Danks' participation in the May 11 incident was apparently substantially completed in May 1978. The investigation was later officially suspended, clearly because the May 19 incident was formally charged and a warrant was issued. Were these the sole facts relevant to the delay in filing charges until October of 1984, the delay here might have been "presumptively prejudicial" in the sense that Danks would not be required to submit affirmative proof of particularized prejudice to his defense in order to be successful on his speedy trial claim.

However, for approximately five years between February of 1979 and March of 1984, Danks was institutionalized in the Logansport State Hospital after he had been found incompetent to stand trial in the proceedings related to the May 19 incident. With respect to this key fact, there is controlling precedent from our supreme court directly on point. In *Harris v. State*, 262 Ind. 208, 214, 314 N.E.2d 45, 49 (1974), it was held that, for purposes of the "reason for the delay" factor of the *Barker* speedy trial test, the three and one-half years the defendant spent in a

hospital between a finding that he was incompetent to stand trial and a determination that he had regained competency was "a fact not chargeable against the State."

■■■ We recognize that Danks was never actually found incompetent to stand trial with respect to the May 11 incident, because no charges were filed in that case until after he was deemed to be competent to stand trial for the May 19 incident in 1984. Nevertheless, it would place form over substance to charge the period Danks spent in the Logansport State Hospital to the State or to hold the State was required to file charges against Danks while he was found to be incompetent in another proceeding. Unlike a claim of mental disease or defect, which is a defense that is fact-specific with regard to a defendant's inability "to appreciate the wrongfulness of the conduct *at the time of the offense*," Ind. Code § 35–41–3–6 (emphasis added), a finding of incompetency to stand trial is related to whether a defendant has the *current* ability to consult rationally with counsel and factually comprehend the proceedings. *Brewer v. State*, 646 N.E.2d 1382, 1384 (Ind.1995). Thus, if Danks lacked the current ability to assist with and comprehend any proceedings related to the May 19 incident, it logically follows that he would have lacked such ability with respect to the May 11 incident.

We are left with the following: of the approximately six years and five months between Danks' official accusation and the filing of charges for the May 11 incident, five years and one month of this time is attributable to Danks' hospitalization in Logansport while he regained his competency to stand trial on the already filed May 19 charges. The remaining one year and four months is fairly attributable to the State.

■■■ With respect to this one year and four months, we agree with the post-conviction court that this delay resulted from official negligence. It appears that little

investigation into Danks' involvement in the May 11 incident was conducted subsequent to May 1978, after which time he was continuously confined either in jail or in a mental health facility. We are not faced with a situation in which the prosecution of Danks was diligently pursued, yet delayed by the need to find Danks or to conduct further investigation into the crimes. Also, in response to an interrogatory posed by Danks, the State indicated it had no "recollection" of why the filing of charges on the May 11 incident was delayed. It is advisable for prosecutors to file charges against a defendant within a short time after investigation into a crime is substantially or entirely completed, though such action is not required. *Cf. United States v. Lovasco,* 431 U.S. 783, 792–95, 97 S.Ct. 2044, 2050–51, 52 L.Ed.2d 752 (1977) (declining to adopt a rule, for due process purposes, that prosecutors are required to file charges once they believe they can prove guilt beyond a reasonable doubt).

■ The record, though, does not indicate that the delay was occasioned by the State's bad-faith attempt to gain an impermissible tactical advantage. Danks argues that the fact the charges on the May 11 incident were filed just weeks before he was set to go to trial on the May 19 incident was indicative of prosecutorial vindictiveness, because the new filing was to be used by the deputy prosecutor as a "bargaining chip" or an "insurance policy." Appellant's brief p. 19. This portion of Danks' brief contains no citations to any authority indicating that filing charges for such purposes is improper; in fact, Supreme Court authority would indicate otherwise. *See Bordenkircher v. Hayes,* 434 U.S. 357, 364–65, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.

To hold that the prosecutor's desire to induce a guilty plea . . . may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself.")

■ Moreover, there is no presumption of prosecutorial vindictiveness where additional charges are filed prior to trial, though vindictiveness may be established if the prosecutor's charging decision was motivated by a desire to punish the defendant for doing something that the law allowed him to do. *Vaxter v. State,* 508 N.E.2d 809, 812 (Ind.1987) (citing *United States v. Goodwin* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). Here, Danks makes no argument that such a motivation existed, and so he has not supported his claim of bad faith delay or "prosecutorial vindictiveness."

■ We now turn to the issue of prejudice. In his brief, Danks does not contend that the delay in filing charges resulted in oppressive pretrial incarceration or undue anxiety, and therefore our discussion will address only whether the delay prejudiced Danks' presentation of a defense to the charges. As noted, approximately one year and four months of the delay in charging Danks is attributable to the State. Standing alone, this period of time is sufficient to trigger the *Barker* inquiry. However, we believe it falls well short of the period of time required to relieve Danks of the burden of demonstrating actual prejudice to his defense caused by the delay. *Cf. Doggett,* 505 U.S. at 657–68, 112 S.Ct. at 2694 (defendant was relieved of this burden where there was an eight and one-half year delay between his indictment and arrest and the entire period of delay was found to be due to official negligence).

On appeal, Danks presents four grounds for finding that the delay caused actual prejudice to his defense; we shall consider each of them. First, he claims the delay precluded any opportunity to investigate a man named "Tony" whom Danks had mentioned during his police interview. Initial-

ly, Danks told the police that he shot the gas station attendant on May 11, 1978. However, he later indicated that he was merely assisting "Tony" or "Tony Rivera" in robbing the gas station, and that "Tony" had shot and killed the attendant. Danks asserts that the delay in filing charges on the May 11 incident impaired counsel's ability to establish "Tony"'s identity and whereabouts, or to establish whether he even in fact existed, and this impairment prevented a determination of "whether it was more likely than not that Danks' claim of being an accessory [to the May 11 murder] was, in fact, true." Appellant's brief pp. 13–14.

 It is immaterial whether Danks' claim of being an accessory was true with respect to the felony murder charge to which Danks pled guilty because in Indiana one may be charged as a principal yet be convicted upon proof that he aided or abetted another in committing the crime. *Hoskins v. State*, 441 N.E.2d 419, 425 (Ind.1982). Danks could have been found guilty of the May 11 murder regardless of whether a jury believed he pulled the trigger, because even by including "Tony" in his description of the May 11 incident, Danks at the least aided in the robbery because he said he demanded the money from the cashier and carried out the cash drawer. Thus, it would have been entirely proper for a jury to convict Danks for felony murder as an aider and abettor. *See Eads v. State*, 577 N.E.2d 584, 587 (Ind.1991).

 Second, the gas station where the murders took place was destroyed at some point between May 20, 1978 and October 2, 1984. The post-conviction court found that this fact constituted "demonstrable prejudice," a finding that the State does not dispute. However, minimal prejudice to a defendant resulting from a post-accusation

delay does not warrant the granting of speedy trial relief. *Barker*, 407 U.S. at 534, 92 S.Ct. at 2194. We find any prejudice resulting from the gas station's destruction to be minimal. Danks does not specify precisely how the gas station's destruction prejudiced his defense, beyond asserting in connection with the existence or nonexistence of "Tony" that an attorney "could have investigated Danks' statements in light of the physical layout of the station to determine whether it was more likely than not that Danks' claim of being an accessory was, in fact, true." Appellant's brief pp. 13–14. We do not agree that because the gas station was razed, Danks was hindered or prevented from putting forward his claims. Such a determination was immaterial with respect to his conviction on the felony murder charge.

Third, Danks claims the delay prevented any investigation into a car that was seen parked behind the gas station at one point on the evening of May 11, 1978, or into a car that drove past the truck driver who discovered the victim's body shortly thereafter. Once again, Danks apparently asserts this lack of investigative opportunity hampered his ability to prove he was merely an accomplice; he argues that "[w]hile these matters were investigated initially, . . . [t]he police made no attempt to corroborate or contradict Danks' claim of being an abettor." Appellant's brief p. 16. This assertion is irrelevant. Danks presents no other claims as to the relevance of the cars.

 Fourth, Danks asserts that the death of a certain Dr. Matthews at some point during his commitment to the Logansport State Hospital hindered his ability to present an insanity defense with respect to the May 11 incident.[4] We rec-

---

4. Although we do not doubt his existence, Dr. Matthews' identity is not clearly established by the record. We do not know his first name or precise date of death, and Danks' brief does not provide record cites in his discussion

concerning Dr. Matthews. The memorandum of law filed with the post-conviction court indicates that Dr. Matthews died after Danks had been at Logansport for approximately three years, which would have been sometime

ognize that the death of a witness obviously has the potential to prejudice a defense, but we see no indication of any such prejudice regarding Dr. Matthews' death. First and foremost, Dr. Matthews apparently died in 1982 during a period of delay not attributable to the State. If the State had filed charges for the May 11 incident before Danks was declared incompetent to stand trial for the May 19 incident, and thus before he was committed to Logansport State Hospital, Dr. Matthews would not have yet treated him and he could not have been a witness regarding Danks' insanity defense. On the other hand, if the State had filed charges on the very day that Danks was declared to have regained his competency, Dr. Matthews would have already been deceased. Second, the record is devoid of any medical or psychiatric reports prepared by Dr. Matthews during Danks' stay in Logansport; rather, the record reflects that in response to Danks' post-conviction request that the State produce any reports received from any mental health institutions where Danks received treatment, the State was able to produce reports and correspondence from five other doctors but none from Matthews.[5] We therefore conclude that Danks has not demonstrated actual prejudice to his defense caused by Dr. Matthews' death.

In sum, we have balanced the four *Barker* factors as follows: the delay in this case was inordinately long and we are assuming that the speedy trial issue was timely raised. The reason for most of the delay in this case was attributable to Danks' incompetency, not inaction by the State, though one year and four months of the delay was fairly attributable to the State's negligence. Given the State's tardiness, Danks' burden of establishing grounds for relief on his speedy trial claim is less than

if the State had diligently pursued prosecution. However, because there is no indication of bad faith on the State's part, and because the one year and four months delay attributable to it is not so lengthy as to raise a true presumption of prejudice under *Doggett,* Danks must provide us with indicators of actual, particularized, specific trial prejudice. He has failed to do this and thus we reject his speedy trial claim.

### III. Ineffective Assistance of Counsel

▮▮▮▮ Next, Danks claims that defense counsel did not provide him with effective assistance. We analyze claims of ineffective counsel according to a two-part test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Jackson v. State,* 683 N.E.2d 560, 562 (Ind.1997). To prevail on such a claim, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Bufkin v. State,* 700 N.E.2d 1147, 1150 (Ind. 1998). To succeed, the petitioner must demonstrate both deficient performance and that such performance deprived him or her of a fair trial. *Douglas v. State,* 663 N.E.2d 1153, 1154 (Ind.1996). A deficient performance is that which falls below an objective standard of reasonableness. *Id.* Prejudice exists when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Cook v. State,* 675 N.E.2d 687, 692 (Ind.1996). Of course, "a different outcome will not constitute prejudice if the ultimate result reached was fair and reliable." *Smith v.*

---

in 1982. We shall accept this as his date of death for purposes of this discussion. Also, Danks at various points has referred to Dr. Matthews as his treating physician, psychiatrist, or psychologist while he was in Logansport. As these words are not synonymous we

are further uninformed as to Dr. Matthews' identity and precisely the type of treatment he rendered to Danks.

**5.** These reports and correspondence themselves are not part of the record.

*State,* 689 N.E.2d 1238, 1245 (Ind.1997). There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Monegan v. State,* 721 N.E.2d 243, 250 (Ind.1999). A petitioner "must offer strong and convincing evidence to overcome the presumption that counsel prepared and executed an effective defense." *Benefiel v. State,* 716 N.E.2d 906, 912 (Ind.1999).

Although egregious errors may be grounds for reversal, we do not second-guess strategic decisions requiring reasonable professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests. *Id.* "Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." *Conner v. State,* 711 N.E.2d 1238, 1248 (Ind.1999). Strategic decisions do not constitute ineffective assistance of counsel. *Smith v. State,* 689 N.E.2d 1238, 1244 (Ind. 1997).

In the context of an ineffective assistance claim following a guilty plea, the *Strickland* two-part test still applies. *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). To satisfy the "prejudice" part of the test, *Hill* stated it must be shown that there is a reasonable probability that, but for counsel's errors, a petitioner would not have pleaded guilty and would have insisted on going to trial. *Id.* Our supreme court has concluded that *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), modified *Hill* to the extent that a defendant is required to show a reasonable probability of acquittal to prove ineffective assistance prejudice following a guilty plea. *State v. Van Cleave,* 674 N.E.2d 1293, 1299 (Ind. 1996).

However, the United States Supreme Court recently held that the Virginia Supreme Court had erred in holding that the *Lockhart* decision had "modified or in some way supplanted the rule set down in *Strickland.*" *Williams v. Taylor,* —— U.S. ——, ——, 120 S.Ct. 1495, 1512, 146 L.Ed.2d 389 (2000). As *Hill* was based upon *Strickland,* and our supreme court relied upon *Lockhart* as modifying *Hill,* the continued viability of *Van Cleave*'s holding that a defendant must show "a reasonable probability of acquittal" at trial in order to prevail in a post-conviction attack based on an ineffective assistance claim following a guilty plea has been called into question, as another panel of this court recently noted. *See Segura v. State,* 729 N.E.2d 594, 596–97 (Ind.Ct.App. 2000), *trans. pending,* (holding that *Van Cleave* is the law in Indiana today and any change in the law as set forth in *Van Cleave* must be made by our supreme court). Thus, as there may presently be some uncertainty regarding the prejudice portion of the ineffective assistance test with respect to guilty pleas, we will focus primarily on the first part of the general *Strickland* analysis: whether defense counsel's performance as Danks' counsel fell below an objective standard of reasonableness.[6]

### A. The Probability of a Death Sentence

Danks advances two primary arguments in support of his ineffective assistance claim. First, he essentially contends that defense counsel misled Danks as to the actual probability of being sentenced to death for the May 11 incident, and that this mistaken belief in the probability of such a sentence persuaded Danks to plead guilty but mentally ill with respect to the felony murder charge. Danks provides

---

6. Were we to use the "reasonable probability of acquittal" standard to analyze Danks' claim our task would be much simpler, as we would not concern ourselves with the reasonableness of defense counsel's performance but would conclude that the end result of Danks'

case if he had chosen to go to trial would have been at the least equivalent to what resulted from the guilty but mentally ill plea: a finding of guilty for felony murder and a sentence of 60 years.

various reasons why he claims the death sentence was not a likely result in this case, ranging from legal reasons based upon the allegedly impermissible inclusion of certain aggravators in the prosecution's information to defense counsel's recollections that the issue of death was not "a major play factor in the case." Record p. 680.

We do not agree that defense counsel erred in assessing the viability of the death penalty count the State had filed for the May 11 incident. It is true that at the time of Danks' plea it was held that the Eighth Amendment did not permit imposition of the death penalty on one who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982).[7] Thus, Danks argues that imposition of the death penalty was "not a foregone conclusion" in this case, Appellant's brief p. 25, because a jury might have believed Danks was merely an accomplice in the robbery of the gas station who did not intend for a killing to take place. However, a jury could also have easily believed "Tony," the alleged principal, was an imaginary individual created by Danks to try to escape blame for the May 11 murder, especially since the existence of "Tony" contradicted earlier statements Danks had made to police. *Cf. Hodge v. State*, 688 N.E.2d 1246, 1249 (Ind.1997) (jury may choose to believe some parts of a witness' testimony and not other parts). Although imposition of the death penalty may not have been a "foregone conclusion," it was still a realistic possibility.

 Danks also claims that one of the death penalty aggravators, that the May 11 murder had taken place during the commission of a robbery, was improperly charged because the statute of limitation for robbery had expired at the time charges were filed in October of 1984. As Danks admits, it is a question of first impression in Indiana as to whether the commission of a felony whose statute of limitation has expired can be utilized as a death penalty aggravator. We do not reach this question today, because we are concerned with whether defense counsel acted as a competent attorney when he decided not to challenge this aggravator, not necessarily with whether the aggravator was in fact valid. We believe that because the law was (and is) unsettled on this issue, it was not ineffective assistance to not challenge this aggravator in light of the great uncertainty as to the result of such a challenge.

 Next, Danks claims that the second death penalty aggravator, namely the conviction for the May 19 murder, was improperly charged. We agree that the wording for this count in the October 1984 information is awkward, in that it states Danks killed Gary Adkins on May 11, 1978, "having previously committed and being convicted of another murder, to-wit:" the murder of Kenneth Thomas on May 19, 1978. Obviously, on May 11, 1978, Danks had not "previously committed" the May 19, 1978 murder; nor had Danks yet been convicted of that murder at that time or in October of 1984. Aside from this confusing language, however, Danks' conviction for the May 19, 1978 murder, which followed the filing of the October 1984 information by a matter of weeks, was a proper death penalty aggravator for the May 11 incident. A trial court may properly consider a previous murder conviction as a death penalty aggravator in another proceeding, even if the first murder conviction did not predate commission of the subsequently-charged murder. *See Hough v.*

---

**7.** This holding was later modified somewhat in *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), which held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement."

*State,* 560 N.E.2d 511, 519 (Ind.1990).[8] If defense counsel had challenged this death penalty aggravator based upon its awkward wording, the State in response most certainly would have amended the charging information at any time after Danks was actually convicted of the May 19 incident so that it was factually correct and any challenge to the aggravator on this technical basis would have been easily rendered moot. *See Thacker v. State,* 556 N.E.2d 1315, 1318 (1990) (trial court did not err by permitting State to amend information during voir dire so that a death penalty aggravator was added).

▇▇▇ Aside from these considerations of the legal propriety of the death penalty count, Danks also claims that defense counsel and the deputy prosecutor both believed that imposition of the death penalty was not a realistic possibility. In support of this argument Danks points to defense counsel's 1997 deposition in which he stated that he didn't "remember the issue of death begin a major play factor in the case," that the death penalty was not a "serious threat to this case," and that he believed imposition of the death penalty following a trial was unlikely. Record pp. 680, 684, 714.

Whatever defense counsel's recollection was in 1997 of the situation Danks faced in the mid–1980's, it is still apparent that Danks' decision to plead guilty was based on a legitimate fear of the ultimate criminal sanction. First, when making his argument before the trial court at Danks' 1986 guilty plea sentencing hearing, defense counsel related his decision to not file a motion challenging the delay in filing the case by saying "[q]uite frankly, I had

to make a decision, do I fight this all the way, or what will happen if I do; or do I try to get this man out someday. I knew what the jury recommended in Porter County [i.e., the death penalty]. I've been before a jury on a death case before and I know, and I knew what the people in La Porte [sic] would do, and so did [Danks]." Record p. 609. As alluded to in this quote, a jury had already once before recommended the death penalty for the May 19 incident, in a case also tried by the deputy prosecutor who would try Danks for the May 11 incident. Although that death penalty recommendation had been rejected by the Porter County trial judge, there seemed to be an understanding that the LaPorte County Circuit Court judge, who would preside over a trial for the May 11 incident, was less willing to override a death penalty recommendation.[9]

Finally, the deputy prosecutor was clear in his deposition that it was his intent to seek the death penalty for the May 11 incident and that had that case gone to trial he would have pursued the request for the death recommendation. Furthermore, defense counsel's deposition statements that he did not believe the death penalty was a likely result in the case were taken out of context, as defense counsel soon thereafter said that the deputy prosecutor "was able to get 12 people to vote death" in Porter County and that what he "should have said better was that [the deputy prosecutor] did not take the 'this is a death case' position with me." Record p. 715. In addition, defense counsel stated that the issue of death was not a serious threat to the case, "[a]ssuming we don't try it." Record p. 684. This clearly indi-

8. Moreover, we disagree with Danks' assertion in his reply brief that *Hough* supports the proposition that a murder conviction cannot be used as a death penalty aggravator if commission of the murder supporting that conviction does not predate the commission of the subsequently charged murder.

9. In his deposition, defense counsel stated his belief that the LaPorte Circuit Court judge "was not beyond airing [sic] on the side of

societal caution." Record p. 702. The deputy prosecutor stated in his 1997 deposition that his perception of this judge was that he would not override a death penalty recommendation. **(785)** Also, this judge did not appear to be inclined toward leniency as he eventually sentenced Danks to 60 years imprisonment for the May 11 incident, which was the maximum available.

cates defense counsel's understanding that if Danks had not in fact pled guilty, his client faced the death penalty.

Thus, it is evident that imposition of the death penalty was more than a realistic possibility if the charges for the May 11 incident had gone to trial; it was a substantial likelihood, given the recent death recommendation obtained by the deputy prosecutor for the May 19 incident, the deputy prosecutor's intent to pursue a death recommendation again, and a trial pending before a different judge that both defense counsel and the deputy prosecutor reasonably believed was not inclined toward leniency.

We cannot ignore the situation that defense counsel faced. The State's evidence included Danks' videotaped statement to police in which he first stated that he shot Gary Adkins after Adkins had been uncooperative in providing Danks with the cash register drawer, then claimed that "Tony" had shot Adkins, though Danks still admitted his participation in the robbery.[10] Danks also stated the shooting was carried out with a .22 caliber gun. This statement was corroborated by the fact that police investigators found the cash register drawer in a canal where Danks had said it would be; that Danks was found to be in possession of both a .22 rifle and a .22 handgun; and that the fatal bullet removed from Adkins' head was a .22. The police reports further indicate that no eyewitnesses were present at the shooting, and that Danks never presented an alibi or other grounds for his innocence aside from his claim that "Tony" shot Adkins. Danks had also recently been convicted for virtually identical acts. We conclude that defense counsel did not render ineffective assistance by not advising Danks that death was an unlikely result of a trial and by not trying to persuade Danks to proceed to trial.

10. Danks had also given an unrecorded statement to police prior to the videotaped statement, in which he again initially stated he

### B. Failure to File Motions

Danks also claims that defense counsel was ineffective because he did not file any motions regarding the evidence in the case, the death specifications, the State's delay in filing charges, or any of the "10 good motions" that defense counsel stated in his deposition could have been made in this case. The difficulty with this argument is that for most of the motions Danks claims could have been made, there is no specification of precisely what those motions should have been or upon what grounds such motions might have been successful. For example, Danks attacks defense counsel's failure to move to suppress Danks' statements to the police but provides us with no basis for gauging the merits of such a motion. To prevail on an ineffective assistance of counsel claim based upon counsel's failure to file motions on a defendant's behalf, it must be demonstrated that such motions would have been successful. See Little v. State, 501 N.E.2d 447, 449 (Ind.1986) (ineffective assistance claim based on defense counsel's failure to file motions rejected when defendant made no showing as to the merits of the motions).

Danks has more specifically challenged defense counsel's failure to challenge the death penalty aggravators and the State's delay in filing charges. However, we have already addressed the question of the validity of the death specifications and any claim that defense counsel was ineffective for failing to file motions challenging the specifications is without merit.

Danks also asserts that Pearson v. State, 619 N.E.2d 590 (Ind.Ct.App.1993), stands for the proposition that a failure to raise a speedy trial claim constitutes per se ineffective assistance of counsel. However, we agree with the post-conviction court that Pearson is clearly distinguishable from the case at bar and only holds that where a defendant would have been

acted alone on May 11 but later claimed that "Tony Rivera" had shot Adkins. **(319–320)**

automatically entitled to discharge under Indiana Criminal Rule 4(C) had a discharge motion been filed, it is ineffective assistance of counsel to not file such a motion.

Here, Danks would not have been automatically discharged had defense counsel filed a motion to dismiss based upon unconstitutional delay; in fact, such a motion would have been properly denied. Furthermore, the question of whether a defendant's constitutional right to a speedy trial has been violated presents a much more complex question than whether the Rule 4(C) speedy trial provision has been violated; the constitutional test requires the balancing of multiple factors and there is no point at which discharge due to delay is automatically mandated, while Rule 4(C) provides definitive, relatively simply calculated deadlines, based upon whether any delays are attributable to a defendant or the State. This leaves a decision to file a constitutionally-based speedy trial motion much more within the discretion of defense counsel. Thus, Danks was not prejudiced by defense counsel's failure to file a motion to dismiss on the ground of unconstitutional delay, nor did defense counsel's decision to not file such a motion fall below an objectively reasonable level.

### Conclusion

Although we agree that Danks' complaint as to the delay in this case is not without merit, and that the State could have acted more promptly to file charges against Danks once its investigation into the May 11 incident was substantially complete, we conclude the speedy trial claim must fail, in the absence of evidence that the State acted in bad faith or that Danks suffered actual, specific, particularized trial prejudice as a result of the delay. Moreover, Danks was not deprived of effective assistance of counsel, because Danks decided to plead guilty but mentally ill to felony murder based upon a wholly reasonable assessment of the likelihood of receiving the death penalty if his case went to trial. Also, Danks has not demonstrated

that had his attorney filed any motions on his behalf, those motions would have been successful. The resolution of these issues is also affected by the substantial burden Danks must meet when seeking review of the denial of post-conviction relief. Thus, we affirm the denial of Danks' post-conviction relief petition.

Affirmed.

SHARPNACK, C.J., and ROBB, J., concur