Michael DAVIS, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 48A02–0404–CR–312.

Court of Appeals of Indiana.

Dec. 10, 2004.

Patrick R. Ragains, Smith & Ragains, Anderson, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Michael Davis appeals his conviction for Battery Resulting in Serious Bodily Injury,[1] a Class C felony. Upon appeal, Davis

---

1. Ind.Code § 35–42–2–1(a)(3) (Burns Code Ed. Repl.2004).

presents the following issues which we restate as:

(1) whether Davis was denied a speedy trial under the Sixth Amendment;

(2) whether the trial court erred when it refused Davis's tendered jury instruction on serious bodily injury; and

(3) whether Davis was denied a trial by a jury of his peers.

We affirm.

On November 27, 2001, Davis was an inmate at the Correctional Industrial Facility in Pendleton. That same day, correctional officer Wayne Fuhrman was on duty when he observed Davis commit a violation of Department of Correction rules. Officer Fuhrman prepared a conduct report and took a copy to Davis's cell. There, Officer Fuhrman unlocked the cell, stepped in, and called for Davis to take the report. Because Davis did not respond, Officer Fuhrman again summoned him. Davis then jumped out of his bed and yelled, "What you talking about?" Transcript at 91. When Officer Fuhrman informed Davis that he had a conduct report to deliver to him, Davis hit him in the mouth, knocking him to the ground.

When Sergeant David Sheveily, who was also working that day, saw Fuhrman lying on the ground, he approached him and found him unconscious, bleeding, and missing some teeth. Eventually Fuhrman regained consciousness and immediately identified Davis as his assailant. During an investigation, internal affairs Officer Thomas Francum interviewed both Davis and his cellmate Joseph Pittman. Although Officer Francum saw no "obvious abrasions or bruises" on the hands of Davis's cellmate, he did see swelling on Davis's right hand near the last two knuckles. Transcript at 290. Officer Francum then informed the Indiana State Police concerning the incident. After re-

viewing Francum's report, a member of the Indiana State Police prepared a probable cause affidavit and forwarded it to the prosecutor of Madison County.

On April 1, 2002, Davis was charged with battery resulting in serious bodily injury, a Class C felony, and battery resulting in bodily injury, a Class D felony. A warrant was issued for Davis's arrest and sent to the sheriff of Madison County. However, the warrant was not served at that time. As a result, in August 2002, when Davis had completed his sentence on an unrelated charged, he was released. He then went to Tennessee where his family lived.

Unaware that Davis had been released, the trial court, on December 6, 2002, set Davis's initial hearing for January 6, 2003, and ordered the Department of Correction to transport Davis from Pendleton on that date. When Davis did not appear, the trial court reset the initial hearing for January 27, 2003. On January 9, 2003, the Department of Correction notified the trial court that Davis had been discharged in August 2002. On February 27, 2003, a member of the Indiana State Police Department notified the trial court that Davis had been located in Tennessee where he was eventually served with the warrant on May 22, 2003. The next day, the trial court held Davis's initial hearing, during which Davis was appointed counsel and given a trial date of December 30, 2003.

In July 2003, Davis hired an attorney who filed an appearance on his behalf on July 28, 2003. As a result, on August 11, 2003, Davis's court-appointed attorney withdrew with the court's permission. On September 2, 2003, Davis filed a motion to dismiss the charges against him pursuant to Criminal Rule 4(C). The trial court held a hearing on the motion to dismiss on September 15, 2003. The trial court de-

nied the motion but moved the trial date to October 7, 2003, due to Criminal Rule 4(C) concerns.

The day before trial, defense counsel filed a subsequent motion to dismiss, in which he claimed that Davis had been denied a speedy trial guaranteed by the Sixth Amendment. On the morning of trial, the trial court heard argument on the motion, but denied it.

As voir dire commenced, defense counsel objected to the lack of African–Americans in a jury pool consisting of only Caucasians. Specifically, defense counsel argued that as an African–American, Davis was being denied a trial by a jury of his peers. The trial court found nothing inherently discriminatory in the jury selection process and proceeded with the trial.

Thereafter, Davis was found guilty as charged. Davis was sentenced to eight years imprisonment on the Class C felony. The Class D felony was dismissed due to double jeopardy concerns.

## I. Speedy Trial

■ Davis contends he was denied a speedy trial in violation of the Sixth and Fourteenth Amendments of the United States Constitution.[2] In particular, he claims that delay between the time he was charged and arrested prejudiced his defense.

■ Initially, we note that both parties agree that Davis became an accused for purposes of the speedy trial provision of the Sixth Amendment when Davis was charged on April 1, 2002. *See Harrell v. State*, 614 N.E.2d 959, 963 (Ind.Ct.App. 1993) (finding defendant became accused for purposes of Sixth Amendment speedy trial right when State filed information), *trans. denied.* However, the State con-

tends that Davis waived his claim by failing to timely assert it at the initial hearing on May 23, 2003, when Davis first learned of his trial date.

■ The speedy trial right may be waived if it is intentionally relinquished. *Barker v. Wingo*, 407 U.S. 514, 525–26, 529, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). However, failing to assert the right at the earliest opportunity or at all does not result in waiver. *See id.* at 528, 92 S.Ct. 2182 ("We reject, therefore, the rule that a defendant who fails to demand a speedy trial forever waives his right."). Rather, if and when a defendant asserts his right is "one of the factors to be considered in an inquiry into the deprivation of the right." *Id. See also Sauerheber v. State*, 698 N.E.2d 796, 805 (Ind.1998) (considering defendant's "decision not to assert his speedy trial right" as one factor in determining whether right was denied). Thus, Davis's decision to wait until September 9, 2003, three and one-half months after his initial hearing, to first assert his speedy trial right did not result in waiver of his claim.

■ We now proceed with our inquiry into the deprivation of the right. "When this Court considers a speedy trial claim based upon the delay between the filing of the information and the arrest of the accused, it applies the balancing test set forth in *Barker v. Wingo*," *supra*, which includes factors such as: (1) length of delay; (2) reason for delay; (3) defendant's assertion of the right; and (4) prejudice to the defendant. *Harrell*, 614 N.E.2d at 963. However, the length of delay is not only a factor to be considered, but also a "triggering mechanism." *Barker*, 407 U.S. at 530, 92 S.Ct. 2182. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the

---

2. Davis did not raise a claim under Article 1, Sections 12, 13, and 23 of the Indiana Constitution in his motion. *See* Appellant's Appendix at 15–19.

other factors that go into the balance." *Id.*

■ Here, the length of delay between the time Davis was charged and brought to trial was approximately eighteen months. Generally "post-accusation delay exceeding one year" is deemed presumptively prejudicial and triggers an analysis under *Barker.* *Hampton v. State,* 754 N.E.2d 1037, 1040 (Ind.Ct.App.2001), *trans. denied.* Indeed, this court has previously held that an eighteen-month delay is sufficient to proceed with the *Barker* analysis. *See Sturgeon v. State,* 683 N.E.2d 612, 617 (Ind.Ct.App.1997), *trans. denied.* Therefore, we proceed with an examination of the *Barker* factors, beginning first with the length of delay.

■ As noted above, the time which lapsed between the time Davis was charged and tried was approximately eighteen months. However, when length of delay is considered as a factor in the *Barker* analysis, this court determines "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett v. United States,* 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). As noted, judicial examination is commonly triggered when delay approaches one year. *Id.* at 652 n. 1, 112 S.Ct. 2686. This is because one year is often considered the "threshold dividing ordinary from 'presumptively prejudicial' delay." *Id.* at 652, 112 S.Ct. 2686. In this case, Davis was tried on October 7, 2003, eighteen months after he was charged. Thus, the delay, which stretched beyond the bare minimum to trigger the *Barker* analysis, was approximately six months.[3]

Under the federal Sixth Amendment constitutional analysis, when the arrest of the defendant precedes the filing of charges, the period of delay to be examined is between the arrest and the trial. *Sauerheber,* 698 N.E.2d at 805. That analysis is not appropriate in the case before us. The battery charge was filed against Davis before he was arrested on that charge. When the charges were filed against Davis he was incarcerated in the Pendleton Correctional Facility.

The warrant and charges certainly could have been read to him at that time but an "arrest" could not have been effected at the same time. An arrest has long been defined as "when officers interrupt [the accused's] freedom and restrict his liberty of movement." *Roberts v. State,* 599 N.E.2d 595, 598 (Ind.1992). The term has also been defined as "the taking of a person into custody, that he may be held to answer for a crime." *Wright v. State,* 766 N.E.2d 1223, 1230 (Ind.Ct.App.2002) (quoting Ind.Code § 35–33–1–5 (Burns code Ed. Repl. 19989)). Because Davis was already incarcerated, the reading of a warrant could not have constituted a restriction upon his liberty and freedom of movement. He was already in custody, albeit not upon the new charge. More to the point, our Supreme Court held in a unanimous opinion that when a defendant is incarcerated on unrelated charges, an arrest for purposes of Criminal Rule 4(C) does not occur until the court in which the new charges are filed orders his return to that court. *Landrum v. State,* 428 N.E.2d 1228, 1230 (Ind.1981); *see also State v. Helton,* 625 N.E.2d 1277 (Ind.Ct.App.1993) (warrant upon Howard County charges read to defendant while he was in custody in Cass

---

3. While we recognize that a constitutional speedy trial claim cannot "be quantified into a specified number of days or months" we do note that one year is the threshold dividing ordinary from presumptively prejudicial delay in this State. *Barker,* 407 U.S. at 523, 92 S.Ct. 2182.

County on other charges but defendant was not ordered to be returned to Howard County until fifteen months later). Although the battery charges were pending in Madison County during Davis's incarceration at Pendleton, the trial court did not order his return to that court to answer the charges. Notwithstanding the phrasing of Indiana Criminal Rule 4(C) which imposes the one-year deadline for bringing a defendant to trial from the date the criminal charge is filed or the date of his arrest, "whichever is later," it is wholly appropriate to view the delay involved as being from the time the charges were filed to the date of trial rather than from the date of arrest on May 22, 2003 to October 7, 2003, the date of trial. *Doggett*, 505 U.S. at 656–57, 112 S.Ct. 2686.

We now consider Davis's assertion of the right. Because the State appears to concede this matter, we will assume that Davis first asserted his speedy trial right on September 9, 2003, when he filed his first motion to dismiss the charges under Criminal Rule 4(C).[4] *See* Appellee's Brief at 6. The State also appears to concede that Davis was unaware that charges had been filed against him in April 2002, and that the earliest he could have asserted his speedy trial right was after his initial hearing on May 23, 2003.[5] *See* Appellee's Brief at 6, 8. However, the State points out that Davis delayed three and one-half months before asserting his right.

■ A defendant's failure to promptly assert a speedy trial right may show that a defendant does not desire to have a speedy trial or is seeking a strategic advantage. *See Eguia v. State*, 468 N.E.2d 559, 564 (Ind.Ct.App.1984) (delaying assertion of

right by nineteen months and seeking two continuances demonstrated defendant did not desire speedy trial); *Barker*, 407 U.S. at 534–36, 92 S.Ct. 2182 (waiting to assert right to determine if accomplice would be convicted was matter of trial strategy). Here, while Davis delayed in asserting his right, the delay was relatively short and does not appear to be a matter of trial strategy. Rather, it appears Davis was merely making arrangements to hire private counsel. Further, after Davis's first motion was denied on September 15, 2003, he filed a subsequent motion a few weeks later. As a result, we find that Davis's assertion of the right weighs in his favor.

Next, we consider the reason for the delay. This factor has also been described as "whether the government or the criminal defendant is more to blame" for the delay. *Doggett*, 505 U.S. at 651, 112 S.Ct. 2686. Davis contends that he "did not have any hand in the delay" and the State agrees. *See* Appellant's Brief at 10, Appellee's Brief at 8. Thus, we consider only how to characterize the State's behavior between the time Davis was charged and arrested.

The State's efforts to bring a defendant to trial can be characterized as one of the following: (1) diligent prosecution; (2) official negligence; or (3) bad faith. *See Doggett*, 505 U.S. at 656–57, 112 S.Ct. 2686 ("Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground."). Davis contends the State "knew or should have known where [he] was when he was charged." Appellant's Brief at 10. The State responds that the

---

4. While Davis's motion was based upon Criminal Rule 4(C), his arguments at the pre-trial hearing on the motion reveal that he was arguing a Sixth Amendment violation.

5. Indeed, when a defendant is not made aware of charges until after his arrest, his decision not to assert the right until then is not weighed against him. *Doggett*, 505 U.S. at 653, 112 S.Ct. 2686.

delay was the result of a simple mistake. In particular, they contend that because the Indiana State Police, and not the Madison County Sheriff's Department, investigated the incident and filed the probable cause affidavit, the sheriff of Madison County did not know where to find Davis.

However, Davis's address at Pendleton is listed on the arrest warrant received by the sheriff on April 2, 2002. The State does not contend, and there is no evidence to suggest, that the address was incorrect. There is also no evidence that the sheriff attempted to serve the warrant at that address or made an effort to see that the warrant was served by some arm of the State. Therefore, for whatever reason the warrant was not served, we conclude that the State did not use reasonable diligence to effectuate an arrest in April 2002. *See Terry v. State,* 400 N.E.2d 1158, 1162 (Ind. Ct.App.1980) (finding State negligent in failing to serve arrest warrant on which defendant's address appeared) (Staton, J., dissenting). In this connection and as earlier noted, for purposes of an Criminal Rule 4(C) arrest, the service of the warrant upon Davis at the Pendleton address, i.e. the Pendleton Correctional Facility would, have to have been coupled with an order from the Madison Circuit Court to transport Davis to the court to answer the charges filed April 1, 2002.

We further observe, however, that there is no evidence that the State. purposely delayed the prosecution to gain an unfair advantage. Therefore, we conclude that the State's failure to effectuate Davis's arrest in April 2002 should be characterized as official negligence and weighed moderately against the State.[6] *See Doggett,* 505 U.S. at 657, 112 S.Ct. 2686 ("Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.").

Finally, we consider prejudice to the defendant. A defendant is prejudiced if he is unable to adequately prepare a defense. *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. The most obvious forms of prejudice occur if a defense witness dies or disappears. *Id.* However, prejudice can also occur if a defense witness is unable to recall past events. *Id.* Davis claims that he was prejudiced because he was unable to interview and/or depose potential witnesses immediately following the incident and to locate favorable witnesses, including the witness he claimed had struck Fuhrman.

In his argument to the trial court, Davis claimed that had he been served in April 2002 while he was still imprisoned where the alleged incident occurred, he could have deposed all of the inmates that were housed near his cell, including his cell mate, to determine if they saw anything and to secure possible inconsistent statements. In particular he argued, "There's just a ton of things that could [have] been looked into if we had an opportunity to go to the prison and interview everybody that was there." Transcript at 26. Davis fur-

---

**6.** We recognize that after January 9, 2003, when the State learned that Davis had not been apprehended, it used reasonable diligence to locate him. Normally, the State would not be charged for time in which it used reasonable diligence. *Doggett,* 505 U.S. at 656, 112 S.Ct. 2686. However, the difficulty the State experienced in locating Davis after January 9, 2003, was a direct result of its negligent conduct in the preceding nine months. Stated another way, had the State diligently pursued Davis in April 2002, it would not have experienced any difficulty locating him as he was still imprisoned at the time. Thus, under these facts the State is responsible for the entire fourteen-month delay between charge and arrest.

ther argued that the delay prejudiced him because it was probable that many of the inmates, that were present on the day of the alleged incident, were no longer imprisoned. Upon appeal, Davis also argues that he was unable to locate an inmate named "Lucky," whom Davis claimed had struck Fuhrman. Transcript at 356, 373, 378, 382–83.[7]

Initially, we note that while Davis claims that he was unable to locate favorable witnesses, including the inmate whom he claimed had struck Fuhrman, he does not argue, and the transcript does not reveal, that these witnesses are dead or that he was unable to locate them after a diligent search. In fact, there is no evidence to suggest that Davis contacted prison officials to secure records or other information which could have helped him locate possible favorable witnesses, including the inmate whom he claims struck Fuhrman. *See Harrell*, 614 N.E.2d at 966 (implying that diligent search would be required to show that favorable witnesses and information could not be secured). Additionally, while Davis contends that the ability to interview and/or depose witnesses immediately after the incident might have revealed favorable evidence or inconsistent statements, there is no evidence that he deposed the State's witnesses at any time before trial or what the alleged inconsistencies or favorable evidence might have

been. Therefore, any prejudice that Davis might have suffered is purely speculative.

Although Davis has failed to demonstrate actual prejudice, because the State was not diligent in pursuing Davis after he was charged, we must still consider whether Davis is entitled to relief. *See Doggett*, 505 U.S. at 657, 112 S.Ct. 2686 ("While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him."). Relief is afforded because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655, 112 S.Ct. 2686. However, "toleration of [government] negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial." *Id.* at 657, 112 S.Ct. 2686 (citation omitted).

Here, the delay which allegedly prejudiced Davis's defense occurred from the time Davis was charged until he was arrested, a period of fourteen months.[8] However, this delay is not excessive, and therefore, we will not presume prejudice. *Compare Danks v. State*, 733 N.E.2d 474, 485 (Ind.Ct.App.2000) (concluding that sixteen-month delay caused by State's negligence did not relieve defendant of burden of showing actual prejudice), *trans. denied*,

---

7. Davis explicitly testified that "Lucky" was housed in an adjacent cell and that it was not Pittman, Davis's cellmate, who struck Fuhrman.

8. The six-month delay discussed under the first *Barker* factor does not reflect the prejudice which Davis claims occurred in this case. As stated above, Davis contends he was prejudiced because he was unable to interview and/or depose potential witnesses soon after the alleged incident occurred. To be sure, we have recognized that securing deposition testimony soon after an alleged incident

for impeachment purposes is a valid defense strategy. *See Harrell*, 614 N.E.2d at 966. However, because of the State's negligence, Davis was denied this opportunity. *See Scott v. State*, 461 N.E.2d 141, 144 (Ind.Ct.App. 1984) (recognizing that when delay occurs between charge and arrest, defendant has no opportunity to prevent prejudice of faded memories by identifying witnesses and memorializing testimony). Therefore, to properly analyze prejudice in this case, we must consider the fourteen-month delay between charge and arrest.

*with Doggett,* 505 U.S. at 658, 112 S.Ct. 2686 (affording defendant relief absent specific prejudice where government's negligence caused six-year delay which "far exceed[ed]" the one-year threshold needed to raise a speedy trial claim).

Having determined that Davis must show actual prejudice, we conclude that his speedy trial claim fails. Though Davis demonstrated that he timely asserted his right and that the State could have done more to bring him to trial sooner, the State's negligence resulted in a relatively short delay and did not demonstrably prejudice his defense. Therefore, we affirm the trial court's conclusion that Davis was not denied his speedy trial right.

## II. Jury Instruction

■ Next, Davis contends that the trial court improperly instructed the jury on the definition of serious bodily injury. As defined by statute, serious bodily injury is bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus. Ind.Code § 35–41–1–25 (Burns Code Ed. Repl.2004). At trial, the trial court instructed the jury that serious bodily injury is "bodily injury that creates a substantial risk of death or that causes unconsciousness or extreme pain." Transcript at 68, 476–77. Thus, the trial court omitted subsections (1), (4), and (5) because in the court's opinion, the evidence did not warrant it.

■ A trial court's decision to give an instruction is left to the court's discretion. *Bradley v. State,* 770 N.E.2d 382, 387 (Ind.Ct.App.2002), *trans. denied.* "We consider whether the instruction correctly states the law, is supported by evidence in the record, and is covered in substance by other instructions which were given." *Id.* Here, Davis contends that the instruction was error, not because the omitted portions were supported by the evidence, but because "the jury should have had the complete picture as to the definition of this term." Appellant's Brief at 11.

Davis's argument is similar to an argument, which was found to be without merit, in *Taylor v. State,* 495 N.E.2d 710 (Ind. 1986). There, the defendant argued that the trial court erred when it gave an edited version of the robbery statute by omitting portions of the statute covering Class C robbery when Class B robbery was charged. *Id.* at 713. Specifically, the defendant argued that "the edited version of the statute removed all context and significance of the various elements of the robbery charge." *Id.* Our supreme court disagreed, reasoning that the trial court merely "edited the statute to apply to the facts in the case, so the statute would be more easily understood by the jury." *Id.* at 713–14. The court explained that "[t]he purpose of an instruction is to inform the jury of the law applicable to the facts." *Id.* at 713. As in *Taylor,* the trial court merely omitted the sections of the statute which it found were irrelevant. Thus, the trial court did not abuse its discretion in refusing Davis's tendered instruction.

■ In any event, we fail to see how Davis was harmed. Because the statute is written in the disjunctive, proof of only one type of injury was required to establish the serious bodily injury. *See Sipe v. State,* 797 N.E.2d 336, 341 (Ind.Ct.App. 2003) (finding that criminal statute, written in the disjunctive, required proof of only one type of conduct to sustain conviction). Davis concedes there was ample evidence that Fuhrman became unconscious because he was struck in the mouth. *See* Appellant's Brief at 11. This alone was

sufficient to establish serious bodily injury, and we therefore find no reversible error.

### III. Jury Selection

 Finally, Davis contends he was denied a trial by a jury of his peers in violation of the Sixth and Fourteenth Amendments. "The United States Supreme Court has long held that the selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." *Wilder v. State*, 813 N.E.2d 788, 791 (Ind.Ct.App.2004). To show a prima facie violation of the fair cross-section requirement, Davis was required to show that: (1) the group being excluded is a distinctive group in the community; (2) the representation of this group in jury pools from which juries are being selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is caused by systematic exclusion. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

African–Americans constitute a distinctive group in the community. *Fields v. State*, 679 N.E.2d 1315, 1318 (Ind.1997). However, Davis's lack of statistical proof prevents this court from analyzing his claim under either the second or third prong of the *Duren* analysis. "[T]he defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Duren*, 439 U.S. at 364, 99 S.Ct. 664. Here, Davis concedes he provided "no data" to the trial court, but asks this court to "consider that there is a sizable African American population in Madison County." Appellant's Brief at 13.

Even were we to assume that African–Americans were underrepresented in this particular case because no African–Americans were part of Davis's jury pool,[9] Davis has still failed to show that African–Americans are regularly underrepresented on jury pools in Madison County as required by the second prong of *Duren*. Without this proof or proof of the percentage of African–Americans in the community, this court is simply unable to determine whether there was a discrepancy between the percentage of African–Americans in jury pools in Madison County and the percentage of African–Americans in the community. *See Fields*, 679 N.E.2d at 1318 (showing that only one African–American was part of defendant's venire did not establish "number of African–American men in the venires from which juries [were] selected [was] not proportional to their number in the community"); *Wilder*, 813 N.E.2d at 793 (establishing underrepresentation in select group of cases did not prove underrepresentation in typical venire in county).[10] Without this proof,

---

**9.** To determine whether a group's representation is proportional to its percentage in the community, this court has applied the absolute disparity test, which measures "the difference between the percentage of the distinctive group eligible for jury duty and the percentage in the pool" and the comparative disparity test, which "is calculated by dividing the absolute disparity by the percentage of the group eligible for jury duty." *Wilder*, 813 N.E.2d at 792. Here, even assuming a small African–American population in Madison County, the inclusion of no African–

Americans in Davis's jury pool would result in an actual disparity in this particular case.

**10.** Indeed, the transcript reflects that the jury selection process used in Madison County does not regularly exclude minorities in jury pools. The trial court in responding to Davis's challenge to the composition of the jury pool commented, "[O]ccasionally I have two or three or four minority people in the jury pool. It just so happens today I didn't have any...." Transcript at 43.

Davis also cannot show that African–Americans were being systematically excluded. *Compare Duren,* 439 U.S. at 366, 99 S.Ct. 664 (concluding that defendant's "demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized") *with Wilder,* 813 N.E.2d at 793 (concluding that defendant, who failed to show African–Americans were being underrepresented on jury venires regularly, did not show systematic exclusion). Therefore, we cannot find that Davis was denied a trial by a jury of his peers.

The judgment is affirmed.

NAJAM, J., and BARNES, J., concur.