## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 31 2020, 10:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| George W. Dixon, *Appellant-Defendant,* | August 31, 2020 |
| v. | Court of Appeals Case No. 19A-CR-1112 |
| | Appeal from the Vigo Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable John T. Roach, Judge |
| | Trial Court Cause No. 84D01-1403-FB-732 |

**Najam, Judge.**

# Statement of the Case

George W. Dixon appeals his convictions, following a jury trial, for unlawful possession of a firearm by a serious violent felon, as a Class B felony, and escape, as a Class D felony, and his adjudication as a habitual offender. Dixon presents five issues for our review, which we revise and restate as the following four issues:

1. Whether the delay in bringing Dixon to trial violated Indiana Criminal Rule 4(C) and amounted to fundamental error under the Sixth Amendment and Article 1, Section 12 of the Indiana Constitution.

2. Whether the trial court erred when it denied Dixon's motions to dismiss the charges against him.

3. Whether the trial court erred under the Fourth Amendment to the United States Constitution when it admitted evidence that law enforcement officers had seized during a warrantless search of his home.

4. Whether his adjudication as a habitual offender constituted an impermissible double enhancement to his conviction for unlawful possession of a firearm by a serious violent felon.

We affirm.

# Facts and Procedural History

On January 7, 2012, the State charged Dixon with possession of cocaine, as a Class D felony, in Cause Number 84D01-1201-FD-94 ("FD-94"). On September 10, while that charge was pending, a confidential informant with the

Vigo County Drug Task Force ("Task Force") purchased cocaine from Dixon. Thereafter, on November 9, Dixon pleaded guilty in FD-94, and the court sentenced him to one year on home detention followed by two years on probation. As a condition of his placement on home detention, Dixon agreed to the following:

> I agree to allow the Vigo County Community Corrections Officers, Probation and/or Law Enforcement Officers or any other agency acting on their behalf to enter my residence without prior notice. I agree to submit to a search of my person, property, or residence at any time[.] I must make all persons who live in the home aware that they and their property are subject to search also. My signature on this contract attests that I have willingly and voluntarily waived my constitutional rights under the fourth amendment[] to the Constitution and Article 1, Section 11 of the Indiana Constitution. I waive these constitutional rights as to my person, vehicle, or residence. Further, any vehicle I am operating, or my residence may be searched at any time, without notice, probable cause, or search warrant. This search may be conducted by a Community Corrections officer, Law Enforcement Officer, or any agency acting on behalf of Vigo County Community Corrections or acting with a reasonable belief that I may be in violation of one of the conditions of my placement in the Community Corrections Program.

Ex. Vol. V at 14.

[4]  On January 17, 2013, Task Force Detective Martin Dooley sent a fax to Dixon's Community Corrections supervisor requesting assistance to search Dixon's residence. In that fax, Detective Dooley stated that the Task Force had "made purchases of crack cocaine" from Dixon and that, on one occasion,

Dixon "came out of his residence and sold crack cocaine to a confidential informant." *Id*. at 26. Dixon's Community Corrections supervisor agreed to assist, and the officers searched Dixon's home that same day. During the search, officers found a handgun, which Dixon was not allowed to possess due to a prior felony conviction. However, officers did not arrest Dixon at that time because he agreed to assist the Task Force with their investigation into the distribution of cocaine in the county.

[5] The next day, Dixon absconded from his residence and did not contact Detective Dooley as instructed to assist the Task Force. On January 25, the State charged Dixon with dealing in cocaine, as a Class B felony, in Cause Number 84D01-1301-FB-212 ("FB-212") based on the controlled buy of cocaine that had occurred on September 10, 2012.[1] Dixon was arrested for that offense on September 8, 2013.

[6] On March 10, 2014, Dixon filed a motion to be released on his own recognizance in FB-212, which motion the trial court granted on March 12. Thereafter, on March 27, the State charged Dixon in this case with possession of a firearm by a serious violent felon, as a Class B felony, based on the gun officers had found in his residence on January 17, 2013. The State also charged him with escape, as a Class D felony, based on his act of absconding from his

---

[1] The confidential informant also purchased cocaine from Dixon on September 11. However, the State did not charge him for that offense because the equipment officers used to record the transaction had malfunctioned.

placement on home detention on January 18.[2]  And the State alleged that he was a habitual offender.  To support its assertion that Dixon was a serious violent offender, the State relied on a 1989 conviction for dealing in cocaine.  And to support its assertion that Dixon was a habitual offender, the State relied on a 1999 conviction for resisting law enforcement and his 2012 conviction in FD-94.  The court held an initial hearing on April 14, 2014, which was the first date that Dixon appeared in front of the court in this case.

[7]  On July 29, Dixon filed a motion to suppress the evidence that officers had found during the January 17, 2013, search of his residence.  In that motion, Dixon asserted that the only basis for the search of his residence was the controlled buy of cocaine, which had occurred prior to his placement on home detention.  Accordingly, he maintained that the Task Force lacked reasonable suspicion that he had violated a term of his placement and, as such, that the search violated his rights under the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution.

[8]  At a hearing on the motion to suppress, Detective Dooley testified that, prior to the search of Dixon's home, he had learned that Dixon was a "person of interest" in a federal case and that a confidential informant working with the FBI had informed him that the informant would be able to purchase cocaine from Dixon.  Tr. Vol. II at 35.  Detective Dooley further testified that that

---

[2]  The State also charged Dixon with theft, as a Class D felony.  But the trial court entered a directed verdict in favor of Dixon on that count.

informant had given credible information in the past, which information led to six convictions. And Detective Dooley testified that he did not provide that information to Vigo County Community Corrections when he requested to search Dixon's home because he was not authorized to discuss the federal investigation with anyone outside of the investigation. Detective Dooley then confirmed that the purpose of the search of Dixon's home was to look for cocaine based on the information he had received from the FBI. Following the hearing, the court found that the controlled buy that had occurred prior to Dixon's placement on home detention did not "undermine the reasonableness" of the search because it was only "one factor in the mix." Appellant's App. Vol. II at 122. Accordingly, the court concluded that Detective Dooley had reasonable suspicion to search Dixon's residence and denied his motion to suppress.

[9] On October 28, 2015, Dixon was found guilty in FB-212. That same day, the court scheduled Dixon's trial in this case for February 29, 2016, which trial date was ultimately continued several times. *See* Appellant's App. Vol. II at 182. On June 13, 2016, Dixon filed a motion for discharge pursuant to Indiana Criminal Rule 4(C). Dixon asserted that it had been 724 days since his arrest, 530 of which were delays that were attributable to the State. Accordingly, Dixon asserted that he was entitled to a dismissal of the charges against him. In response, the State asserted that, at most, 269 days were chargeable to it at the time the court set his jury trial for a date outside of the one-year period and that Dixon did not object when the court set that date. As such, the State

maintained that Dixon "sat idly by" when the court set his trial date and, as a result, his failure to object to that trial date was a waiver of any claim under Criminal Rule 4(C). *Id*. at 162. The trial court denied that motion following a hearing.

[10] On January 21, 2017, Dixon filed a motion to dismiss the charges against him. In that motion, he asserted that the State was barred from filing the charges against him as the current offense "was or could have been determined" in the same action as FB-212 since the evidence in this case "was the direct consequence of the controlled buy on September 10, 2012[,] and search based on that buy conducted on January 17, 2013." Appellant's App. Vol. III at 25. Dixon further asserted that the "instant prosecution is for an offense with which [he] should have been charged in the former prosecution." *Id*. Accordingly, Dixon asserted that the doctrine of *res judicata* and Indiana's successive prosecution statute barred the State from filing the current charges against him.

[11] Thereafter, on February 10, Dixon filed another motion to dismiss the charges in which he asserted that the State had only filed the current charges against him after he had filed a motion to be released on his own recognizance in FB-212, which motion the trial court granted. Dixon maintained that the State only filed the current charges against him in order to place him back in jail, which action "amount[ed] to vindictive prosecution." *Id*. at 30. The trial court denied both of Dixon's motions to dismiss.

[12] On September 12, 2018, Dixon filed another motion for discharge pursuant to Criminal Rule 4(C). In that motion, he asserted that it had been 1,626 days since his arrest and that 825 of those days were attributable to the State. As such, he maintained that he was entitled to a discharge of the charges against him. The court denied that motion without a hearing.

[13] The court then held a trifurcated jury trial on September 17 and 18, 2018, and February 25, 2019.[3] During the trial, Dixon lodged a continuing objection to the admission of evidence that officers had found during the search of his house on the ground that that search violated his federal and state constitutional rights. The court overruled Dixon's objection. Following the first two phases of the trial, the jury found Dixon guilty of possession of a firearm by a serious violent felon, as a Class B felony, and escape, as a Class D felony.

[14] Prior to the third stage, Dixon filed a motion to dismiss the habitual offender enhancement. Dixon alleged that the State was using his conviction in FB-94 to support that enhancement but that that conviction is what led to his placement on home detention. And he alleged that his act of fleeing from his placement on home detention in that offense is what led to the escape charges in the current offense. Accordingly, he asserted that there "are multiple connections with the possession and escape charges related through this cause" and FD-94. Appellant's App. Vol. IV at 22. In other words, he asserted that

---

[3] The court initially held the third phase of Dixon's trial on September 19, 2018. However, that phase resulted in a mistrial based on statements Dixon had made in front of the jury.

his conviction in FB-94 was part of the same *res gestae* as the charge for escape such that a double enhancement was improper. In response, the State asserted that it had used "separate and distinct" convictions to support the charge for possession of a firearm by a serious violent felon and the habitual offender adjudication and that the habitual offender enhancement was proper. *Id*. at 24. The court denied Dixon's motion.

At the conclusion of the third stage, the jury found that Dixon was a habitual offender. The court entered judgment of conviction accordingly and sentenced him to an aggregate sentence of twenty-eight years in the Department of Correction. This appeal ensued.

# Discussion and Decision

## *Issue One: Time to Bring Dixon to Trial*

### Indiana Criminal Rule 4(C)

Dixon first asserts that the delay in bringing him to trial violated Indiana Criminal Rule 4(C). "In reviewing Criminal Rule 4 claims, we review questions of law *de novo*, and we review factual findings under the clearly erroneous standard." *State v. Harper*, 135 N.E.3d 962, 972 (Ind. Ct. App. 2019), *trans. denied*. Indiana Criminal Rule 4(C) provides in relevant part as follows:

> No person shall be held on recognizance or otherwise to answer
> a criminal charge for a period in aggregate embracing more than
> one year from the date the criminal charge against such
> defendant is filed, or from the date his arrest on such charge,
> whichever is later; except where a continuance was had on his

motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar[.]

When a defendant receives a summons in lieu of an arrest, the one-year speedy trial period begins to run on the date the court orders the defendant to appear in court. *See Johnson v. State*, 708 N.E.2d 912, 915 (Ind. Ct. App. 1999).

[17] It is well settled that a defendant "must object to a trial setting at the earliest opportunity if []he learns within the period provided by the rule that the case is set for trial at a time beyond the date permitted." *Id*. "If a defendant fails to object at the earliest opportunity to a trial set outside the prescribed one-year period, []he is deemed to have acquiesced to the belated trial date." *Id*.

[18] On appeal, Dixon correctly identifies April 14, 2014, the day he first appeared in court, as the date on which his one-year speedy trial period began. Accordingly, he asserts that the one-year period ended on April 14, 2015. He further asserts that, as the trial court "did not schedule the trial date for February 29, 2016 until October 28, 2015," which was 562 days after his initial hearing, the one-year period had expired and he was under no duty to object when the court scheduled his trial date outside of that period. Appellant's Br. at 26.

[19] Dixon has not met his burden on appeal to show that the trial court erred. First, Dixon asserts that the one-year period expired on April 14, 2015. Dixon

ignores the fact that the one-year period is tolled anytime a defendant files a motion to continue. *See* Ind. Crim. Rule 4(C). And, here, Dixon filed a motion to continue on September 21, 2014, which tolled the period until March 2, 2015.[4]

[20] In addition, Dixon had filed a motion to suppress evidence on July 29, 2014. While it is not automatically considered a delay attributable to the defendant under Criminal Rule 4(C), the delay caused by a motion to suppress may be attributable to a defendant. *See Curtis v. State*, 948 N.E.2d 1143, 1150 (Ind. 2011). And in his motion for discharge, Dixon accepted, for the sake of argument, that his motion to suppress tolled the one-year period as of that date. *See* Appellant App. Vol. II at 204. But, in his brief on appeal, Dixon fails to acknowledge the fact that he filed a motion to suppress, nor does he make any argument to explain why the delay caused by his motion should not now be attributable to him.[5] As such, Dixon has failed to meet his burden on appeal to demonstrate that his motion to suppress did not toll the one-year period.

---

[4] In a footnote, Dixon appears to acknowledge that his motion to continue created a delay that was attributable to him. *See* Appellant's Br. at 26 n.1.

[5] For the first time in his reply brief, Dixon asserts that the delay caused by the motion to suppress was not attributable to him. However, because Dixon makes this argument for the first time in his reply brief, it is waived. *See Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005).

[21] As a result of Dixon's motion to continue and motion to suppress, Dixon tolled the period within which the State needed to bring him to trial for 216 days—from July 29, 2014, to March 2, 2015.[6] As such, while 562 days passed between his initial hearing and the date the court set his jury trial, only 346 days had passed that were attributable to the State. Thus, contrary to Dixon's assertions, because less than one year had passed that was attributable to the State when the court set his jury trial for outside of the one-year period, Dixon had the duty to object to his trial date at that time.[7] *See Johnson*, 708 N.E.2d at 915. Dixon's failure to object on October 28, 2015, constitutes waiver.

[22] Still, in the alternative, Dixon contends that his first opportunity to object to the trial date was at a hearing on February 22, 2016. Reply Br. at 6. However, at that hearing, Dixon only mentioned that he had "several motions to file." Supp. Tr. Vol. VI at 74. He did not specify that one of those motions was a motion to discharge pursuant to Indiana Criminal Rule 4(C). Dixon did not file a motion to discharge until June 13, 2016, which was almost nine months after

---

[6] As discussed above, Dixon's motion to suppress tolled the period from July 29, 2014, until February 2, 2015. And his motion to continue tolled the time period from September 21, 2014, until March 2, 2015. However, there is an overlap between those dates. Removing any overlap between the filings, Dixon's motions tolled the time period from July 29, 2014, when he first filed the motion to suppress, until March 2, 2015, when his motion to continue was resolved, which equates to 216 days.

[7] Because we hold that the motion to continue and the motion to suppress tolled the one-year time period such that less than one year had passed when the court set the matter for a jury trial, we need not consider the State's additional argument that Dixon acquiesced to a large delay when he agreed to let the State proceed to trial in FB-212 prior to scheduling the trial for the current offenses.

the court had first set his trial for outside of the one-year period. Accordingly, we hold that Dixon did not timely object to the setting of his trial for outside of the one-year period.

[23] In sum, less than one year had passed that was attributable to the State at the time the court set his jury trial for outside of the one-year period. Accordingly, Dixon had a duty to object. Because he failed to timely object to his trial date, Dixon acquiesced to a belated trial. *See Johnson*, 708 N.E.2d at 915. Accordingly, the delay in bringing Dixon to trial did not violate Indiana Criminal Rule 4(C).

## Federal and State Constitutions

[24] Dixon also asserts that, even if the delay in bringing him to trial did not violate Indiana Criminal Rule 4(C), that delay violated his rights under the Sixth Amendment and Article 1, Section 12 of the Indiana Constitution. Dixon acknowledges that he did not raise this issue to the trial court. *See* Appellant's Br. at 24. Thus, to prevail on appeal, he must demonstrate that fundamental error occurred during the trial. *See Hall v. State*, 108 N.E.3d 351, 355 (Ind. Ct App. 2018).

[25] To prove fundamental error, one must "'show that the trial court should have raised the issue *sua sponte* due to a blatant violation of basic and elementary principles, undeniable harm or potential for harm, and prejudice that makes a

fair trial impossible.'" *Taylor v. State*, 86 N.E.3d 157, 162 (Ind. 2017) (quoting *Harris v. State*, 76 N.E.3d 137, 140 (Ind. 2017)). A finding of fundamental error essentially means that the trial judge erred by not acting when he or she should have, even without being spurred to action by a timely objection. *Hall*, 108 N.E.3d at 355.

[26] On appeal, Dixon makes thorough and cogent argument on the question of whether the delay violated his constitutional rights, but his argument on the question of fundamental error is inadequate, and he has waived this issue for our review. Indeed, the only argument Dixon makes on this issue is that the "unreasonable delay constituted fundamental error." Appellant's Br. at 30. But Dixon does not provide any argument to explain why the delay constituted fundamental error or why the court should have acted *sua sponte*. Because he has not made cogent argument in support of his fundamental error claim, it is waived.

### Issue Two: Denial of Motions to Dismiss Charges

[27] Dixon next asserts that the trial court erred when it denied his motions to dismiss the charges against him. In general, we review a trial court's ruling on a motion to dismiss a charging information for an abuse of discretion, which occurs only if a trial court's decision is clearly against the logic and effect of the facts and circumstances. *See Tuell v. State*, 118 N.E.3d 33, 35 (Ind. Ct. App.

2019).  But where the parties do not dispute the facts and we are presented with a question of law, we apply a *de novo* standard of review.  *See id* at 35-36.

[28]  On appeal, Dixon contends that the trial court erred when it denied his motions to dismiss because the doctrine of *res judicata* and Indiana's successive prosecution statute barred the State from filing the current charges and because the charges amounted to vindictive prosecution.  We address each argument in turn.

### *Res Judicata*

[29]  On this issue, Dixon first maintains that the charges against him violated the doctrine of *res judicata*.  As our Supreme Court has stated:

> *Res judicata* is a legal doctrine intended to prevent repetitious litigation of disputes that are essentially the same, by holding a prior final judgment binding against both the original parties and their privies.  It applies where there has been a final adjudication on the merits of the same issue between the same parties.  Stated in more detail:
>
>     1.  the former judgment must have been rendered by a court of competent jurisdiction;
>
>     2.  the former judgment must have been rendered on the merits;
>
>     3.  the matter now in issue was or might have been determined in the prior suit; and

> 4. the controversy adjudicated in the former suit must have been between the parties to the present action or their privies.

> If any element is absent, *res judicata* does not apply.

*Ind. State Ethics Comm'n v. Sanchez*, 18 N.E.3d 988, 993 (Ind. 2014) (internal quotation marks and citations omitted).

[30] On appeal, Dixon maintains that his conviction in FB-212 "was a former judgment rendered by a court that resolved the matter on the merits and involved the same parties, even down to the specific detective involved in both matters." Appellant's Br. at 31. He further asserts that the "various issues litigated in this case could have been determined in the prior action," and, as such, the doctrine of *res judicata* barred the State from filing the charges. *Id*.

[31] We cannot agree that Dixon's conviction in FB-212 barred the State's charges in the current offense. In the language of *res judicata*, the matters at issue before the court during the current proceedings were simply not the same as the issue before the trial court during the proceedings in FB-212. *See Montgomery v. State*, 58 N.E.3d 279, 281 (Ind. Ct. App. 2016). The issues before the trial court during the current proceedings were whether Dixon was a serious violent felon in possession of a firearm and whether he had escaped from his placement on home detention, while the issue before the court in FB-212 was whether Dixon had sold cocaine.

[32] Indeed, the State charged Dixon in FB-212 because he had sold cocaine to a confidential informant on September 10, 2012. And the State charged Dixon with the current charges based on a firearm officers had found in his home on January 17, 2013, and because he had fled from his placement on home detention on January 18. In other words, the charges in the current offense are independent of the charge in FB-212. We are not persuaded by Dixon's suggestion that the State was required to file all of the factually distinct charges in one information. Accordingly, we conclude that the doctrine of *res judicata* did not bar the State from filing the current charges against him.

### Indiana's Successive Prosecution Statute

[33] Dixon also asserts that the court erred when it denied his motion to dismiss the charges against him because Indiana's successive prosecution statute barred the State from filing the charges. Pursuant to that statute, a prosecution is barred if all of the following exist: (1) there was a former prosecution of the defendant for a different offense or for the same offense based on different facts, (2) the former prosecution resulted in an acquittal or a conviction of the defendant or in an improper termination under section 3 of this chapter, and (3) the instant prosecution is for an offense with which the defendant should have been charged in the former prosecution. Ind. Code § 35-41-4-4(a) (2020). Here, there is no dispute that the first two elements are satisfied. Dixon was convicted of dealing in cocaine in FB-212. Thus, the outcome of this issue turns on whether the current prosecution is for offenses for which the State should have charged Dixon in the previous prosecution.

[34] As our Supreme Court has previous stated, "[t]he words 'should have been charged' must be read in conjunction with Indiana's joinder statute." *Williams v. State*, 762 N.E.2d 1216, 1219 (Ind. 2002). The joinder statute provides in relevant part:

> A defendant who has been tried for one (1) offense may thereafter move to dismiss an indictment or information for an offense which could have been joined for trial with the prior offenses under section 9 of this chapter. The motion to dismiss shall be made prior to the second trial[] and shall be granted if the prosecution is barred by reason of the former prosecution.

I.C. § 35-34-1-10(c).

[35] Read together, "'our legislature has provided that, where two or more charges are based on the same conduct or on a series of acts constituting parts of a single scheme or plan, they *should* be joined for trial.'" *Williams*, 762 N.E.2d at 1219 (quoting *State v. Wiggins*, 661 N.E.2d 878, 880 (Ind. Ct. App. 1996)) (emphasis original to *Wiggins*). In order to determine whether offenses are part of a single scheme or plan, "we examine whether they are connected by a distinctive nature, have a common modus operandi, and a common motive." *Id*. at 1220 (quotation marks omitted).

[36] On appeal, Dixon maintains that Indiana's successive prosecution statute barred the State from filing the charges against him because the "offenses in this case and the offense under FB-212 were so connected to one another that discussion of what occurred in this case could not be understood without discussing the offense under FB-212." Appellant's Br. at 34. Specifically, he

maintains that the current charges "were the direct consequence of a search based solely on the controlled buy under FB-212" and that "no new evidence was collected or investigated after the waiver search." *Id.*

[37] However, as discussed above, the State charged Dixon in FB-212 based on the fact that he had sold cocaine to a confidential informant on September 10, 2012. And the State charged Dixon with the current offense based on the fact that, in January 2013, he had possessed a firearm despite a prior felony conviction and because he had fled from his home following his placement on home detention in FD-94. Those offenses occurred several months apart, are distinct in nature, have a different modus operandi, and lack a common motive. The only connection between the two offenses is that officers found the firearm, which motivated Dixon to flee, during a search of Dixon's home that was supported, in part, by the controlled buy that led to his charges in FB-212.

[38] Dixon's offenses in the current matter and FB-212 were not so connected as to constitute a single scheme or plan such that they should have been joined for trial. *See Williams*, 762 N.E.2d at 1219. Accordingly, the trial court did not err when it denied Dixon's motion to dismiss the charges against him under Indiana's successive prosecution statute.

### Vindictive Prosecution

[39] Dixon next contends that the court erred when it denied his motion to dismiss the charges against him because the charges amounted to vindictive prosecution. "The Due Process clauses of Article 1, section 12, of the Indiana

Constitution and the Fourteenth Amendment to the United States Constitution prohibit prosecutorial vindictiveness." *Owens v. State*, 822 N.E.2d 1075, 1077 (Ind. Ct. App. 2005). Vindictiveness may be established if the prosecutor's charging decision was motivated by a desire to punish the defendant for doing something that the law allowed him to do. *See Danks v. State*, 733 N.E.2d 474, 483 (Ind. Ct. App. 2000).

[40] Here, Dixon specifically asserts that the State elected to file the current charges "only after Dixon was released from jail when he successfully argued for his release" in FB-212. Appellant's Br. at 37. And Dixon maintains that "[t]here could be no other reason for the State's delay in charging Dixon except that the State acted with actual vindictiveness." *Id*. We cannot agree.

[41] Contrary to Dixon's assertions, there was a valid reason to support the State's delay in filing the current charges against him other than to punish him for obtaining release from custody in FB-212. Detective Dooley testified that the delay in filing the charges against Dixon was due to the fact that the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") "was thinking about taking the case." Tr. Vol. II at 65. Indeed, the State did not take any action while the ATF "look[ed] into" Dixon's possession of the handgun. *Id*. And the State ultimately filed the charges against Dixon after the ATF had decided that "it would be better off to go to the state side." *Id*.

[42] The charges in the current case were charges that the State had a legitimate right to file. *See Cox v. State*, 475 N.E.2d 664, 671 (Ind. 1985). And the fact the

State waited to file the charges until the ATF had decided not to pursue its own action does not equate to vindictive prosecution. As the State had a legitimate reason to file the charges when it did other than to punish Dixon for obtaining a release from custody in FD-212, Dixon has not demonstrated that the charges in the current offense amounted to vindictive prosecution. As such, the trial court did not err when it denied Dixon's motion to dismiss the charges against him.

### Issue Three: Warrantless Search

Dixon next asserts that "the warrantless waiver search of [his] house" violated his constitutional rights and, as such, that the court erred when it admitted evidence officers had seized during that search. Appellant's Br. at 38 (emphasis removed). As we have explained:

> [The defendant's] arguments that police violated his Fourth Amendment and Article 1, Section 11 rights raise questions of law we review *de novo*. As the United States Supreme Court has explained with respect to the Fourth Amendment, as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal, while findings of historical fact underlying those legal determinations are reviewed only for clear error. The Indiana Supreme Court applies the same standard under Article 1, Section 11. In other words, we review whether reasonable suspicion or probable cause exists under a standard similar to other sufficiency issues—whether, without reweighing the evidence, there is substantial evidence of probative value that supports the trial court's decision.

*Redfield v. State*, 78 N.E.3d 1104, 1106 (Ind. Ct. App. 2017) (internal quotation marks and citations omitted), *trans. denied*. Further, when a defendant challenges a warrantless search, the burden is on the State to prove the search fell within an exception to the warrant requirement. *See Kelly v. State*, 997 N.E.2d 1045, 1051 (2013).

[44] On appeal, Dixon acknowledges that, pursuant to his placement on home detention in FD-94, he consented to a warrantless search of his home conducted by a "Community Corrections officer, Law Enforcement Officer, or any agency acting on behalf of Vigo County Community Corrections or acting with a reasonable belief that [he] may be in violation of one of the conditions of my placement in the Community Corrections Program." Ex. Vol. V at 14. Based on that provision, Dixon contends that an officer is only authorized to conduct a warrantless search of his home "so long as the search was supported by reasonable suspicion." Appellant's Br. at 38. And Dixon maintains that, because the only basis for the search was the two controlled buys of cocaine that had occurred in September 2012, which was prior to his placement on home detention, Detective Dooley lacked reasonable suspicion to search his home.

[45] As the Supreme Court of the United States has stated, reasonable suspicion

> is dependent upon both the content of information possessed by police and its degree of reliability. The standard takes into account the totality of the circumstances—the whole picture. Although a mere "hunch" does not create reasonable suspicion, the level of suspicion the standard requires is considerably less

than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.

*Navarette v. California*, 572 U.S. 393, 397 (2014) (citations and quotation marks omitted).

Here, Detective Dooley knew Dixon and knew that Dixon had a history of drug offenses, which included a prior criminal history of dealing in cocaine. In addition, before he searched Dixon's home, Detective Dooley received information that a confidential informant, who was "being used locally and federally," had advised detectives "that he would be able to purchase an amount of cocaine from Dixon." Tr. Vol. II at 35. Detective Dooley had used that informant in the past, and that informant had previously provided Detective Dooley with information that "led to one search warrant and six convictions." *Id.* Detective Dooley had also learned that, in January 2013, Dixon was "a person of interest" in an FBI investigation. *Id.* Based on the totality of the circumstances, we hold that Detective Dooley readily had reasonable suspicion to search Dixon's home.

Still, Dixon appears to assert that officers lacked reasonable suspicion to search his home because Detective Dooley did not provide any of that information to Vigo County Community Corrections. However, we see nothing in Dixon's community corrections agreement that would require Detective Dooley to provide Community Corrections officers with information such that the Community Corrections officers also had reasonable suspicion that Dixon had violated a term of his placement. Rather, we agree with the State that Dixon's

waiver agreement authorized a law enforcement officer to conduct a warrantless search of Dixon's home *either* if the officer was acting on behalf of Vigo County Community Corrections or acting with a reasonable belief that Dixon had violated a term of his placement on home detention. And, as discussed above, Detective Dooley had reasonable suspicion to search Dixon's home. Accordingly, the trial court did not err under the Fourth Amendment to the United States Constitution when it admitted evidence officers had seized during the warrantless search of Dixon's home.[8]

### *Issue Four:  Double Enhancement*

[48]  Finally, Dixon asserts that the court erred when it denied his motion to dismiss the habitual offender allegation. Specifically, he contends that his adjudication as a habitual offender and the corresponding enhancement to his sentence for possession of a firearm by a serious violent felon constituted an impermissible double enhancement. "It has long been established that double enhancements are not permissible unless there is explicit legislative direction authorizing them." *Dye v. State*, 972 N.E.2d 853, 856 (Ind. 2012) ("*Dye I*"), *clarified on reh'g*, 984 N.E.2d 625 (Ind. 2013) ("*Dye II*"). And a "defendant convicted of unlawful

---

[8]  In his brief on appeal, Dixon asserts that the search of his home also violated his rights under Article 1, Section 11 of the Indiana Constitution. However, while Dixon acknowledges that we interpret and apply that provision independently from the Fourth Amendment, he does not provide an independent analysis under that provision. Accordingly, we conclude that Dixon has not preserved for appellate review any claim under Article 1, Section 11. *See Wilkins v. State*, 946 N.E.2d 1144, 1147 (Ind. 2011) ("Because he provides no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived."). Insofar as Dixon may have preserved a state constitutional claim for our review, for the same reasons his federal rights were not violated, neither were his rights under Article 1, Section 11, and we affirm the trial court on this issue as well.

possession of a firearm by a serious violent felon may not have his or her sentence enhanced under the general habitual offender statute by proof of the same felony used to establish that the defendant was a 'serious violent felon.'" *Mills v. State*, 868 N.E.2d 446, 452 (Ind. 2007).

[49] Here, the State alleged that Dixon was a serious violent felon based on a 1989 conviction for dealing in cocaine. And the State alleged that he was a habitual offender based on a 1999 conviction for resisting law enforcement and his 2012 conviction in FD-94. Those convictions are separate and distinct from one another. Accordingly, the State did not seek to have Dixon's sentence enhanced under the general habitual offender statute by proof of the same felony used to establish that he was a serious violent felon. However, our inquiry does not end there.

[50] Even where a sentencing enhancement under the general habitual offender statute is not based on the same felony that was used to establish that a defendant is a serious violent felon, the enhancement is nonetheless improper if it was based on a felony that was part of the same *res gestae*. *See Dye II*, 984 N.E.2d at 629. Our Supreme Court has stated that, "[a]lthough *res gestae* is a term regularly used in Indiana's common law of evidence to denote facts that are part of the story of a particular crime," it also includes "acts that are part of an uninterrupted transaction." *Id.* (quotation marks omitted). And a crime that is continuous in its purpose and objective is deemed to be a single uninterrupted transaction. *Id.*

In *Dye*, the State charged Dye with unlawful possession of a firearm by a serious violent felon and alleged that he was a habitual offender. To prove that he was a serious violent felon, the State relied on a 1998 conviction for attempted battery with a deadly weapon. *Dye I*, 972 N.E.2d at 855. And to prove that he was a habitual offender, the State relied on a 1993 conviction for forgery and a 1998 conviction for possession of handgun within 1,000 feet of a school. *Id*. at 856. Dye pleaded guilty to the firearms charge, and the jury found that he was a habitual offender. On appeal, the Supreme Court found that the trial court's enhancement of his sentence based on the habitual offender adjudication was an impermissible double enhancement to his conviction for possession of a firearm by a serious violent felon. *Id*. at 858.

On rehearing, the Supreme Court noted that Dye's 1998 conviction for attempted battery with a deadly weapon, which supported the finding that he was a serious violent felon, and his 1998 conviction for possession of handgun within 1,000 feet of a school, which supported his habitual offender adjudication, both arose out of the same confrontation that Dye had had with a police officer. *Dye II* at 629. The Court further noted that the State charged both offenses under the same cause number and resolved them in the same plea agreement. *Id*. As such, the Court determined that the two offenses were part of the same "uninterrupted transaction" and that they arouse out of the same *res gestae* such that his adjudication as a habitual offender was an improper double enhancement. *Id*. at 630.

[53] Here, Dixon acknowledges that "neither of the predicate offenses supporting the habitual-offender enhancement were the 'same felony' as the cocaine dealing felony underlying the SVF conviction." Appellant's Br. at 44. But Dixon contends that he was placed on home detention as a result of his conviction in FD-94. And he asserts that his current charge for escape was a result of his fleeing from that placement. He further contends that he only fled his placement in FD-94 after officers had found a gun during a search of his home during that placement on home detention.

[54] In other words, Dixon maintains that "one cannot understand the complete context of the escape and [serious violent felon] convictions without referring to the circumstances surrounding the conviction" in FD-94. Appellant's Br. at 45. Accordingly, he contends that his convictions for escape and unlawful possession of a firearm by a serious violent felon in the current offense were part of the same *res gestae* as the offense in FD-94, which the State used to support the habitual offender enhancement, such that the double enhancement was improper. We cannot agree.

[55] Unlike in *Dye*, the conviction used to support the finding that Dixon is a serious violent felon did not arise out of the same event, nor was it part of the same "uninterrupted transaction" as one of the convictions used to prove that he is a habitual offender *See Dye II*, 984 N.E.2d at 630. Indeed, the State charged Dixon in FD-94 in January 2012 after he had possessed cocaine. And the State filed the current charges against Dixon because he had possessed a firearm and fled his placement on home detention over a year later in January 2013. We

are not persuaded by his argument that the offenses arose out of the same *res gestae* simply because he was on home detention as a result of the offense used to show that he is a habitual offender at the time he committed the current offenses. Accordingly, we hold that the trial court did not err when it denied Dixon's motion to dismiss the habitual offender allegation.

## Conclusion

In sum, less than one year had passed that was attributable to the State at the time the court set his jury trial for outside of the one-year period. Because Dixon failed to object to a belated trial date, the delay in bringing Dixon to trial did not violate Criminal Rule 4(C). Further, Dixon has failed to make a cogent argument that the delay in bringing him to trial violated his federal and state constitutional rights. In addition, the trial court did not err when it denied Dixon's motions to dismiss the charges against him because neither the doctrine of *res judicata* nor Indiana's successive prosecution statute prohibited the State from filing the charges and because the charges did not amount to vindictive prosecution. Further, the trial court did not err when it admitted evidence officers had seized during a warrantless search of Dixon's home because Detective Dooley had reasonable suspicion to search Dixon's home. Finally, the trial court did not err when it denied Dixon's motion to dismiss the habitual offender allegation because the prior felonies used to support the habitual offender adjudication were not part of the same *res gestae* as his conviction used

to show that he is a serious violent felon. Accordingly, we affirm Dixon's convictions.

[57] Affirmed.

Bradford, C.J., and Mathias, J., concur.