

IN THE

# Court of Appeals of Indiana

Heidi Carter,

*Appellant-Defendant*



FILED
May 30 2024, 8:41 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee-Plaintiff*

May 30, 2024

Court of Appeals Case No.
23A-CR-817

Appeal from the Vanderburgh Circuit Court

The Honorable David Kiely, Judge

Trial Court Cause No.
82C01-2110-MR-5792

**Opinion by Judge Pyle**
Judges Tavitas and Foley concur.

**Pyle, Judge.**

## Statement of the Case

Heidi Carter ("Carter") appeals, following a jury trial, her conviction for murder.[1] She argues that: (1) the trial court erred when it denied her motion to dismiss the refiled murder charge;[2] and (2) there is insufficient evidence to support her conviction. Concluding that: (1) the trial court did not err when it denied her motion to dismiss; and (2) there is sufficient evidence to support her murder conviction, we affirm the trial court's judgment.

We affirm.

## Issues

1.    Whether the trial court erred when it denied Carter's motion to dismiss the refiled murder charge.

2.    Whether there is sufficient evidence to support Carter's murder conviction.

---

[1] IND. CODE § 35-42-1-1 and I.C. § 35-41-2-4. The trial court also entered judgment of conviction for two counts of Level 1 felony rape and two counts of Level 3 felony criminal confinement. Carter does not appeal those convictions.

[2] The trial court also denied Carter's motion to dismiss a refiled felony murder charge. However, after the trial court denied Carter's motion, the State dismissed the refiled felony murder charge. Accordingly, we only review the trial court's denial of Carter's motion to dismiss the refiled murder charge.

## Facts

The facts most favorable to the verdict reveal that in 2021, thirty-six-year-old Carter lived in Evansville. Her fiancé, Carey Hammond ("Hammond") lived in a work release safe house but visited Carter every morning at 7:30 when he got off work. In June 2021, Carter sent a social media message to a friend and told the friend that she and Hammond wanted "a pet[,]" which she explained was "a submissive lil slut [Carter and Hammond could] have anytime all the time and do what we want[.]" (Ex. Vol. 5 at 207).

In July 2021, Carter sent another friend a social media message wherein she stated that she was "[a] sociopath[,]" who liked "righteous violence[.]" (Ex. Vol. 5 at 208, 209). The following month, Carter sent a friend the following social media message: "I want a pet. . .when I'm done using and abusing her then sell her or dispose[.]" (Ex. Vol. 5 at 210). At the end of September 2021, Carter sent Hammond the following social media messages: "I've not found ANYONE yet!!!! . . . I have a feeling ur gonna have to be the one to get a gurl[.] . . . [I]f by chance there's an opportunity and you are able to bring home a candidate then don't be ridiculous BRING THE PET HOME[.]" (Ex. Vol. 5 at 215).

In October 2021, Carter placed on a dating app a classified ad seeking a woman to join her and Hammond in sexual activities. A.S. ("A.S.")[3] and her boyfriend, Tim Ivy ("Ivy) had placed a similar classified ad on the same dating app, and A.S. and Carter began texting each other. In two of the text messages, Carter referred to A.S. as "[her] Pet[.]" (Ex. Vol. 5 at 132, 134). Carter and A.S. discussed restraints, sexual activity, and boundaries. A.S. told Carter that she "ha[d] no objection to being tied up or tied down" but that "anal [was] a hard limit." (Ex. Vol. 5 at 170, 173). When A.S. asked Carter to come to her house, Carter responded that her fiancé would not allow it and that her fiancé "would KILL someone over [her.]" (Ex. Vol. 5 at 141). When A.S. suggested that both she and Ivy meet Carter at Howell Park, Carter responded that her "fiancé won't have it[.]" (Ex. Vol. 5 at 149). Carter then clarified that "as long as [Ivy] [did]n't touch her[,] [her] fiancé should be fine[.]" (Ex. Vol. 5 at 150).

In the early morning hours of October 19, 2021, Carter sent A.S. the following text message: "Can you come fuck me? Ur dude can watch[.]" (Ex. Vol. 5 at 159). A.S., who had just used methamphetamine, responded that Carter had "really good timing [because A.S.] was getting fucked up right [then.]" (Ex. Vol. 5 at 195). After Carter and A.S. had agreed to meet at a park, Carter sent a friend a social media message, which stated that Carter had "one bitch on her way" and that the "other bitch" would be headed there by "daybreak[.]" (Ex.

---

[3] In her appellate brief, Carter refers to A.S. as A.F. However, at trial, A.S. explained that A.F. was her previous married name and that her correct name was A.S. Accordingly, we refer to her as A.S.

Vol. 5 at 217). At approximately 3:30 a.m., A.S. texted Carter that she and Ivy were at the park. A.S. asked Carter where she was and told Carter that she and Ivy were going home. Carter then texted her home address to A.S. At 3:44 a.m., A.S. texted Carter that she and Ivy had arrived at Carter's house.

[7] A.S. and Ivy entered Carter's house and smoked methamphetamine with one of Carter's friends while Carter showered. After Carter had gotten out of the shower, her friend left. Thereafter, Carter, A.S., and Ivy watched pornographic movies and a snuff film "where the woman [was] killed and . . . the man still had sex with her." (Tr. Vol. 2 at 32).

[8] Although Carter and A.S. had initially agreed that they would engage in sexual activity while Ivy watched, they subsequently agreed that Ivy would participate in the sexual activity as well. Carter wore "a strap-on [penis] and was penetrating [A.S.] while [Ivy] was penetrating [Carter] at the same time." (Tr. Vol. 2 at 56).

[9] While Carter, A.S., and Ivy were engaged in this sexual activity, Hammond arrived at Carter's home at his usual time. He walked into Carter's bedroom, saw Ivy penetrating Carter, grabbed a baseball bat, and began hitting Ivy on his head and back. When A.S. jumped on Hammond's back to try and stop him from hitting Ivy, Carter grabbed A.S.'s hair, pulled her off Hammond, pushed her to the floor, and held a gun in her face. Hammond continued to hit Ivy with the baseball bat and then turned around, swung the baseball bat like a golf club, and hit A.S. in the back of the head. Carter told A.S. that it was "fucked

up" that they had just watched a snuff film and "look what just happened." (Ex. Vol. 6, State's Ex. 147 at 1:37:04). Hammond stated that there were not going to be any witnesses and that both A.S. and Ivy had to die, and Carter stated that she knew people in Indianapolis who could dispose of a body.

[10] Carter and Hammond bound Ivy's wrists and ankles with duct tape. They also covered Ivy's face with duct tape and then "made a game" of kicking him multiple times. (Tr. Vol. 2 at 60). Carter and Hammond then restrained A.S. on the floor at the end of the bed with Velcro restraints that were already attached to the bed.

[11] After Carter and Hammond had restrained A.S., Carter told Hammond to do whatever he wanted to do to A.S. Carter specifically told Hammond to rape A.S. and "put it in [her] mouth." (Tr. Vol. 2 at 65). Further, although A.S. had previously told Carter that she was "not okay with any kind of anal sex[,]" Carter told Hammond to "fuck [A.S.] in the ass" with the baseball bat. (Tr. Vol. 2 at 37). Hammond engaged in vaginal and oral intercourse with A.S. against her will. While Hammond was sexually assaulting A.S., Carter was walking back and forth with the gun in her hand encouraging Hammond's actions. A.S. believed that Carter "was definitely in charge of [Hammond]." (Tr. Vol. 2 at 48). After Hammond had sexually assaulted A.S., Carter and Hammond had sexual intercourse on the bed to which A.S. had been restrained.

[12]     Thereafter, Carter and Hammond forced A.S. to give them the password to her cell phone. Carter and Hammond looked through the phone, noticed that it was A.S.'s daughter's eighteenth birthday that day, and threatened "to go get her too" if A.S. did not cooperate with them. (Tr. Vol. 2 at 39).

[13]     Later that morning, after Carter had left the house to find someone to clean it, Ivy began to regain consciousness. He initially thought that he was late for work and then realized that he could not see because his eyes were covered with duct tape. A.S. was able to calm Ivy down a couple of times, but when he stated that he had to urinate, he could not be consoled and began yelling. Hammond came into the room, told Ivy to shut up, and kicked him. When Ivy attempted to reach out and grab Hammond, Hammond grabbed the bungee cord or piece of red cloth that were both around Ivy's neck and strangled him. A.S., who could not see well because she did not have her glasses, believed that she had heard Hammond kill Ivy. Hammond asked A.S. if she thought this was a game and told her that she was not going home. Hammond then engaged in sexual intercourse with A.S. against her will while she was still restrained on the floor at the end of the bed.

[14]     In the meantime, Carter had gone to a house where a renovation company was doing work to find someone to clean her house. She found Cynthia Weinzapfel ("Weinzapfel"), whom she had met the previous day. Carter and Weinzapfel used methamphetamine, and Carter showed Weinzapfel her gun. Carter told Weinzapfel that she had had to do some rough work that day and pointed to

some blood on her boots. Carter asked Weinzapfel to return to her house with her and to clean it because her landlord was going to inspect it.

[15] Carter and Weinzapfel arrived at Carter's house at approximately 4:30 p.m., and Hammond was angry that Carter had brought Weinzapfel to the home. Weinzapfel immediately began cleaning because there "was just dog poop and pee about this far deep through the whole house, you could smell it from outside[.]" (Tr. Vol. 2 at 127). While Weinzapfel was cleaning in the front of the house, Carter and Hammond went into the bedroom at the back of the house, wrapped a dead Ivy in blankets, and dragged his body into the dining room. Carter then left the house to purchase cigarettes and food. When Weinzapfel was ready to clean the dining room, Hammond encouraged her to take a break. Hammond and Weinzapfel smoked methamphetamine and talked. When Weinzapfel made a joke about cross-dressing, Hammond grabbed a baseball bat and told her to sit down and shut up or he would "bash [her] head in like he did earlier that day[.]" (Tr. Vol. 2 at 128). Weinzapfel told Hammond that she wanted to leave, but Hammond took her backpack and phone and told her to wait until Carter returned.

[16] Carter, who had been gone for several hours, eventually returned to her home without food or cigarettes. Hammond and Carter ordered a pizza, which was delivered at approximately 10:30 p.m. Carter, Hammond, and Weinzapfel went into the dining room to eat the pizza, and Carter jokingly told Weinzapfel to sit on the Christmas tree, which looked "like a really long ottoman, covered in clothes, clutter, and dirt and trash." (Tr. Vol. 2 at 131). Hammond jokingly

commented that it was "Christmas tree Tim." (Tr. Vol. 2 at 130). Before Weinzapfel sat down, one of Carter's dogs sniffed the ottoman-like object and backed away from it. Carter commented that "the dog don't even want to be near something like that[.]" (Tr. Vol. 2 at 130). A confused Weinzapfel sat down on the ottoman-like object, put her hands down, and realized that she was sitting on a body. Weinzapfel screamed, jumped up, grabbed her backpack, and fled out the door. As she left the house, Weinzapfel heard a woman's voice calling for help from the back of the house.

[17] After briefly hiding in Carter's van, Weinzapfel ran down the street and saw a state police vehicle in the driveway four houses away from Carter's house. Weinzapfel pounded on the front door of the state police trooper's house. When the trooper came to the door, Weinzapfel told him that she had seen a dead body in the house down the street and that there was also a woman being held hostage in that house. The trooper contacted local law enforcement, and multiple Evansville Police Department officers arrived at the scene, surrounded the house, and apprehended Carter outside the house near her van. When Hammond exited the house holding an item in his hands with his arms extended, law enforcement officers, who believed that he was holding a gun, told him to drop the item in his hands and surrender. When Hammond failed to comply with the officers' commands, the officers shot and killed him. The officers then entered the house and found A.S, who was transported to the hospital. The officers also found Ivy's body.

[18]     Before Carter was transported to the police station, an officer performed a pat down search and found a loaded handgun in the leg of Carter's pants. When Carter arrived at the police station, an Evansville Police Department detective interviewed her. During the two-hour interview, Carter denied participating in the crimes perpetrated against A.S. and Ivy but told the detective that Hammond had said from the beginning that there were not going to be any witnesses and that both A.S. and Ivy had to die. Carter further told the detective that she had not called 911 when she had left the house because she had been afraid that Hammond would kill everyone.

[19]     Forensic pathologist Dr. James Jacobi ("Dr. Jacobi") performed Ivy's autopsy. According to Dr. Jacobi, Ivy had suffered multiple forms of trauma, and there was evidence of three possible causes of death. The first possible cause of death was manual strangulation because Ivy had bruises on his neck. The second possible cause of death was ligature strangulation because Ivy had crease marks on his neck. The third possible cause of death was suffocation because Ivy's face was "completely incased in duct tape[.]" (Tr. Vol. 2 at 122). Further, according to Dr. Jacobi, he could not "distinguish as to which . . . was to finish him off but you have three fatal type injuries." (Tr. Vol. 2 at 123).

[20]     In October 2021, the State charged Carter with murder, felony murder, Level 1 felony rape, three counts of Level 3 felony criminal confinement, and Level 5 felony carrying a handgun without a license. The murder and rape charges were based on accomplice liability. In November 2022, the State amended the

charging information to include two additional counts of Level 1 felony rape. Both rape charges were based on accomplice liability.

[21] One week later, the State filed a motion to dismiss, without prejudice, the murder and felony murder charges. The trial court granted the State's motion. Carter's trial for Level 5 felony carrying a handgun without a license, three counts of Level 1 felony rape, and three counts of Level 3 felony criminal confinement began on November 28, 2022 ("the first trial"). On the third day of the first trial, the State filed a motion to dismiss one of the Level 3 felony confinement charges. The trial court granted the motion.

[22] After deliberating for twelve hours in the first trial, the jury advised the trial court that it had reached an agreement on the carrying a handgun without a license charge but was deadlocked on the other five charges. The trial court advised the State and Carter that the jury was deadlocked, and the following colloquy ensued:

> THE COURT: It's my understanding that the jury has a verdict in Count 5 only which is the possession of the handgun, they're locked up on all the other Counts. I'm going to bring the jury in, identify the presiding juror, and ask if further deliberations would be helpful. If the presiding juror tells me yes[,] I'm going to send them back in. If not[,] I'm going to ask the rest of them if any of them think further deliberations would be helpful. If I get a yes[,] I'm going to send them back[,] but if I get no's[,] then I'm going to take the verdict in Count 5 and mis-try the other counts which means we'll do this again at another time.
>
> DEFENSE COUNSEL: Yes, sir. Judge after you talk to the jurors before making a ruling on whether you're going to declare

this a mistrial or not would[,] you allow me to at least make a brief argument before making that ruling or not?

THE COURT: Yeah, I'll let you make an argument.

DEFENSE COUNSEL: Okay. Thank you.

(Supp. Tr. Vol. 2 at 248-49).

[23] Thereafter, the jury entered the courtroom, and the trial court confirmed with the presiding juror that the jury had reached a verdict on the carrying a handgun without a license charge. The trial court then asked the presiding juror if he believed that further deliberations on the remaining charges would be helpful, and the presiding juror responded that further deliberations would not be helpful. Thereafter, the trial court asked if any of the other jurors believed that further deliberations would be helpful, and another juror responded that further deliberations would not be helpful. The trial court asked the presiding juror for the verdict form on the carrying a handgun without a license charge and announced that the jury had convicted Carter of Class A misdemeanor carrying a handgun without a license.[4] The trial court confirmed with the presiding juror that the jurors had been unable to reach unanimous verdicts on the other charges and stated as follows:

---

[4] The trial court subsequently entered judgment of conviction for Class A misdemeanor carrying a handgun without a license and sentenced Carter to one-year in the county jail. The trial court further noted that Carter had served that sentence because she had accrued 433 days of jail time credit while incarcerated pending the first trial. Accordingly, the trial court "closed" that case, and that conviction is not included in this appeal. (Second Supp. Tr. Vol. 2 at 14).

We thank you very much and we understand how hard it is, it's been a long, long deliberation and we're getting close to 12 hours. You're going to be excused. . . . What happens on a mistrial is that we're going to, the parties have an opportunity to do it again, the State can bring those charges where you didn't have a unanimous verdict again, so with that being said you're excused[.]

(Supp. Tr. Vol. 3 at 2).

[24] After excusing the jury, the trial court asked defense counsel if he wanted to make an argument. Defense counsel responded as follows:

Well I did, Judge. I understand you've already made your ruling as far as the mistrial goes but I just wanted to state that they had been going at this for about 12 hours, I was going to ask the Court to consider seeing if it might have been beneficial at least to the jurors if they think if we had a chance to come back tomorrow morning and continue to discuss this because it is almost 10 p.m. in the evening and they have been going for 12 hours but I understand you've made your ruling but that was going to be my request is that we do this in the morning.

(Supp. Tr. Vol. 3 at 2-3). Following defense counsel's response, the trial court did not further mention Carter's argument or the mistrial and asked the parties when they wanted to schedule a new trial date.

[25] In December 2022, the State filed an amended charging information that included two Level 1 felony rape charges and three Level 3 felony criminal confinement charges. In addition, the State refiled the murder and felony murder charges.

[26] One month later, in January 2023, Carter filed a motion to dismiss the murder and felony murder charges for "[v]indictive [r]echarging[.]" (App. Vol. 2 at 155). In support of her motion, Carter cited *Owens v. State*, 822 N.E.2d 1075, 1077 (Ind. Ct. App. 2005), wherein this Court stated that "[u]nless there is new evidence or information discovered to warrant additional charges, the potential for prosecutorial vindictiveness is too great for courts to allow the State to bring additional charges against a defendant who successfully moves for a mistrial."

[27] At the January 2023 hearing on Carter's motion, Carter argued that she had asked the trial court to dismiss the murder and felony murder charges because there had not been any newly discovered evidence between the date of the mistrial and the date of the refiling of the charges. The State responded that the presumption of prosecutorial vindictiveness did not apply in this case because Carter had not successfully moved for a mistrial. Rather, the trial court had declared a mistrial because of a hung jury. The trial court denied Carter's motion to dismiss the murder and felony murder charges. Thereafter, the State dismissed the felony murder charge.

[28] Before Carter's second trial, the trial court renumbered the charges against Carter as follows: (1) Count 1 – Level 1 felony rape; (2) Count 2 – Level 3 felony criminal confinement; (3) Count 3 – Level 3 felony criminal confinement; (4) Count 4 – Level 3 criminal confinement; (5) Count 5 – Level 1 felony rape; and (6) Count 6 – murder.

[29]  At Carter's three-day second trial, the jury heard the facts as set forth above and convicted Carter of all six charges. The trial court merged two of the Level 3 felony criminal confinement convictions and entered judgment of conviction for murder, two counts of Level 1 felony rape, and two counts of Level 3 felony criminal confinement. Thereafter, the trial court sentenced Carter to sixty-five (65) years for the murder conviction, forty (40) years for each of the two Level 1 felony rape convictions, and sixteen (16) years for each of the two Level 3 felony criminal confinement convictions. In addition, the trial court ordered the sentences to run concurrently with each other for an aggregate sentence of sixty-five (65) years in the Department of Correction.

[30]  Carter now appeals.

## Decision

[31]  Carter argues that: (1) the trial court erred when it denied her motion to dismiss the refiled murder charge; and (2) there is insufficient evidence to support her conviction. We address each of her contentions in turn.

### 1. Motion to Dismiss

[32]  Carter first argues that the trial court erred when it denied her motion to dismiss the refiled murder charge. She specifically argues that "the re-filing of the murder charge after a hung jury was vindictive prosecution." (Carter's Br. 22). We disagree.

[33] "The Due Process clauses of Article 1, section 12, of the Indiana Constitution and the Fourteenth Amendment to the United States Constitution prohibit prosecutorial vindictiveness." *Owens v. State*, 822 N.E.2d 1075, 1077 (Ind. Ct. App. 2005). Vindictiveness may be established if the prosecutor's charging decision was motivated by a desire to punish a defendant for doing something that the law allowed him to do. *Danks v. State*, 733 N.E.2d 474, 483 (Ind. Ct. App. 2000), *trans. denied*.

[34] For example, prosecutorial vindictiveness can occur if "more numerous or more severe charges" are filed against an accused "after the accused has successfully exercised his statutory or constitutional rights to an appeal," unless the State meets its "heavy burden of proving that any increase in the number or severity of the charges was not motivated by a vindictive purpose." *Cherry v. State*, 414 N.E.2d 301, 305 (Ind. 1981). As with a successful appeal, the same applies to a successful motion for a mistrial because "unless there is new evidence or information discovered to warrant additional charges, the potential for prosecutorial vindictiveness is too great for courts to allow the State to bring additional charges against a defendant who successfully moves for a mistrial." *Warner v. State*, 773 N.E.2d 239, 243 (Ind. 2002). On the other hand, the United States Supreme Court has noted that "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." *United States v. Goodwin*, 457 U.S. 368, 382 (1982).

[35] We find our decision in *Sisson v. State*, 985 N.E.2d 1 (Ind. Ct. App. 2012), *trans. denied*, to be instructive in this case. In the *Sisson* case, the State dismissed a firearm charge and an habitual offender allegation before Sisson's first trial. After that trial ended in a deadlocked jury and a mistrial, the State refiled the firearm charge and the habitual offender allegation, and a second jury convicted Sisson of the firearm charge and determined that he was an habitual offender.

[36] On appeal, Sisson argued that the refiling of the firearm charge and the habitual offender allegation was vindictive prosecution. However, we distinguished the factual scenario in Sisson's case from the cases in which we had previously found prosecutorial vindictiveness. Specifically, we pointed out that the State had not filed more numerous or severe charges against Sisson following a successful appeal. *Id*. at 11. Rather, the State had refiled previously dismissed counts after Sisson's first trial had ended in a mistrial because of a deadlocked jury. *Id*. We further noted that Sisson had not moved for a mistrial in an effort to preserve his right to a fair trial as a result of some error. *Id*. Rather, the trial court had *sua sponte* declared a mistrial, without objection from Sisson or the State, after the jury had indicated that it had been unable to reach a verdict. *Id*. We concluded that because Sisson's mistrial had not resulted from Sisson's exercise of any statutory or constitutional right, he could not claim that he had been punished by the State for exercising such a right, and his prosecutorial vindictiveness claim failed. *Id*.

[37] Here, as in *Sisson*, the State did not file more numerous or severe charges against Carter following a successful appeal. Rather, the State refiled a

previously dismissed murder charge after Carter's first trial had ended in a mistrial because of a deadlocked jury. Further, Carter did not move for a mistrial in an effort to preserve her right to a fair trial as a result of some error. Rather, the trial court *sua sponte* declared a mistrial after the jury indicated that it had been unable to reach verdicts on several of Carter's charges. Here, as in *Sisson*, because Carter's mistrial did not result from Carter's exercise of any statutory or constitutional right, she cannot claim that she was punished by the State for exercising such a right.

[38]     In an attempt to distinguish the facts of her case from those in the *Sisson* case, Carter argues that unlike Sisson, she objected to the trial court's *sua sponte* declaration of a mistrial. Assuming, without deciding, that Carter telling the trial court that she was going to ask it to consider if it might have been beneficial to have the jurors return for deliberations the following morning was an objection to the mistrial, that objection does not change the result in this case. The doctrine of prosecutorial vindictiveness exists "[i]n order to avoid chilling the exercise of the right to an appeal" or the right *to seek* a mistrial. *Owens*, 822 N.E.2d at 1077; *Warner*, 773 N.E.2d at 242. Without this doctrine, defendants would be discouraged from challenging the misdeeds of the State, which in turn might encourage the State to commit misdeeds. Even if the defendant objects to the mistrial, the doctrine and its rationale have little application to a case in which a mistrial resulted not from any improper conduct of the State but rather a deadlocked jury.

Because our review of the record in this case reveals nothing to suggest that Carter was being subjected to a greater sentence as a punishment for the exercise of any of her constitutional rights, her prosecutorial vindictiveness claim fails. *See Sisson*, 985 N.E.2d at 11. Accordingly, the trial court did not err when it denied her motion to dismiss the refiled murder charge.

## 2. Sufficiency of the Evidence

Carter next argues that there is insufficient evidence to support her murder conviction. Our standard of review for sufficiency of the evidence claims is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or judge witness credibility. *Id.* We will affirm the conviction unless no reasonable fact finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict. *Id.* at 147.

Here, the State charged Carter with Ivy's murder under a theory of accomplice liability. INDIANA CODE § 35-42-1-1(1) defines murder as "knowingly or intentionally kill[ing] another human being[.]" "The accomplice liability statute permits a defendant to be found guilty as an accomplice without proof the defendant committed every element of the crime when the defendant 'knowingly or intentionally aids, induces, or causes another person to commit an offense.'" *Jackson v. State*, 222 N.E.3d 321, 336-37 (Ind. Ct. App. 2023) (quoting I.C. § 35-41-2-4), *trans. denied*. "A person who aids another in

committing a crime is just as guilty as the actual perpetrator." *Madden v. State*, 162 N.E.3d 549, 557 (Ind. Ct. App. 2021).

[42] There is no bright-line rule in determining accomplice liability. *Jackson*, 222 N.E.3d at 337. Rather, the particular facts and circumstances of each case determine whether a person was an accomplice. *Id*. In determining whether a person aided another in the commission of a crime, we consider the following four factors: "'(1) presence at the scene of the crime; (2) companionship with another engaged in criminal activity; (3) failure to oppose the crime; and (4) a defendant's conduct before, during, and after the occurrence of the crime.'" *Id*. (quoting *Garland v. State*, 788 N.E.2d 425, 431 (Ind. 2003)).

[43] Carter contends that "the State did not present sufficient evidence to convict [her] of murder under these factors." (Carter's Br. 16).[5] We disagree.

[44] Our review of the evidence most favorable to Carter's murder conviction reveals that in the summer of 2021, Carter and A.S. began texting each other after both women had placed classified ads seeking other women to join them and their male partners in sexual activities. Carter told A.S. that she could not go to A.S.'s house because her fiancé would kill someone over her. Carter and

---

[5] Carter also contends that specific intent to kill is a required element of murder and that there is insufficient evidence to support her conviction because the State "presented no evidence that Carter intended that [Ivy] be killed." (Carter's Br. 16). However, our Indiana Supreme Court has stated that specific intent to kill is not required for a murder conviction. *Echols v. State*, 722 N.E.2d 805, 808 (Ind. 2000). Rather, either a knowing or intentional killing is sufficient to support a murder conviction. *See id*. Accordingly, Carter's argument fails.

A.S. eventually agreed that A.S. and Ivy would come to her house and Ivy would watch the two women engage in sexual activity. Carter told A.S. that as long as Ivy did not touch her, her fiancé should be fine.

[45] A.S. and Ivy arrived at Carter's house at 3:30 a.m. on October 19, 2021. After smoking methamphetamine and watching pornographic videos and a snuff film, Carter, A.S., and Ivy agreed that Ivy would participate in the sexual activity as well. While Carter, A.S., and Ivy engaged in sexual activity, Hammond arrived at Carter's home at 7:30 a.m., his usual time. When he walked into the bedroom and saw Ivy penetrating Carter, Hammond grabbed a baseball bat and began hitting Ivy on his head and back. When A.S. attempted to intercede by jumping on Hammond's back, Carter grabbed A.S.'s hair, pulled her off Hammond, pushed her to the floor and held a gun to her face. Hammond then attacked A.S. with the bat. After both A.S. and Ivy had been subdued, Carter told A.S. that it was "fucked up" that they had just watched a snuff film and to look at what had just happened. (Ex. Vol. 6, State's Ex. 147 at 1:37:04). Carter and Hammond covered Ivy's face with duct tape, bound his wrists and ankles, and made a game of kicking him multiple times. Hammond stated that there were not going to be any witnesses and that both A.S. and Ivy had to die. Carter said that she knew people in Indianapolis who could dispose of a body.

[46] Despite Hammond's statement that both A.S. and Ivy had to die, Carter left A.S. and Ivy in the house with Hammond when she went to find someone to clean her house. While Carter was out of the home, she did not call 911.

Rather, she smoked methamphetamine with Weinzapfel, showed Weinzapfel the blood on her boots, and told Weinzapfel that she had had to do some rough work that day. While Carter was out of the home, A.S. believed that she heard Hammond kill Ivy by strangling him. When Carter and Weinzapfel returned to Carter's home, Weinzapfel began cleaning, and Carter helped Hammond wrap Ivy's dead body in blankets and drag his body into the dining room. Later that night, when Carter, Hammond, and Weinzapfel went into the dining room to eat pizza, Carter jokingly told Weinzapfel to sit on the Christmas tree, which was Ivy's dead body wrapped in blankets.

[47] Carter's presence at the scene of the crime, her companionship with Hammond, her failure to oppose the crime, and her conduct before, during, and after Ivy's murder all support a finding of accomplice liability. Based on this evidence, a reasonable jury could have found that the State proved beyond a reasonable doubt that Carter aided, induced, or caused Hammond to kill Ivy. The evidence is, therefore, sufficient to support Carter's murder convictions.

[48] Affirmed.


Tavitas, J., and Foley, J., concur.


ATTORNEY FOR APPELLANT

Yvette M. LaPlante
Gonterman & Meyer LLC
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana